# EXHIBIT A

## Removal of Reporting Requirements

Notice of Proposed Rulemaking, 91 Fed. Reg. 46,332–46,349 (July 23, 2026)

RIN 3046-AB37

### OFFICIAL SOURCE MATERIAL

United States Government Publishing Office, Federal Register, Vol. 91, No. 140, Proposed Rules.

The attached official publication includes the EEOC proposal, hearing and comment deadlines, regulatory analysis, and proposed amendatory text.

### CLERICAL NOTE

*This exhibit establishes the existence, contents, publication, and nonfinal procedural status of the NPRM. It does not establish the truth of disputed policy, constitutional, or economic assertions within the notice.*

Prepared as an exhibit cover sheet; the following pages reproduce the source material without substantive alteration.

## II. Description of the Proposed Order

On May 22, 1963 (28 FR 5082),[1] we issued a regulation allowing for the use of Citrus Red No. 2 as a color additive on the skins of oranges that are not intended or used for processing (or, if so used, are designated in the trade as ''packing-house elimination''), and that meet minimum maturity standards established by or under the laws of the States in which the oranges are grown (*i.e.,* mature oranges), subject to certain specifications, restrictions, labeling requirements, and certification. Under 21 CFR 74.302, Citrus Red No. 2, oranges colored with Citrus Red No. 2 must bear not more than 2.0 parts per million of the color additive, calculated on the basis of the weight of the whole fruit. Citrus Red No. 2 is not authorized for other uses as a color additive. The regulation also specifies that all batches of Citrus Red No. 2 must be certified in accordance with our regulations under 21 CFR part 80.

Our records indicate that Citrus Red No. 2 was last batch certified in 2020 and that FDA has not received any requests to batch certify Citrus Red No. 2 since that time (Ref. 1). We tentatively conclude that the absence of requests to certify a batch of Citrus Red No. 2 since 2020 indicates that the color additive is no longer manufactured for uses established in § 74.302. Without a certification, Citrus Red No. 2 may not be used as a color additive in food in the United States. Considering this information, we tentatively conclude that the authorized use of Citrus Red No. 2 has been abandoned. Therefore, we tentatively conclude that the color additive listing for Citrus Red No. 2 at § 74.302 is outdated and unnecessary and we propose to repeal this color additive regulation. To facilitate the phase-out of any remaining batch certified Citrus Red No. 2 supply that may be in use, we propose to provide an extended effective date and a compliance date to allow for its depletion.

If this proposed order is finalized, in accordance with 21 CFR 80.32(h), all certificates for any existing batches and portions of batches of Citrus Red No. 2 would cease to be effective for use in food on the effective date for the removal of § 74.302, and any lots of Citrus Red No. 2 would be regarded as uncertified after that date. The use of Citrus Red No. 2 in any food after its certificate ceases to be effective would result in such food being adulterated. However, as indicated below, we propose to provide a compliance date to allow for depletion of any remaining certified batches of Citrus Red No. 2, after the effective date.

## III. Proposed Effective Date and Compliance Date of a Final Order

We propose that any final order based on this proposed order be effective 90 days following its publication in the **Federal Register**. In the event that the food industry needs time to use up existing reserves of certified batches of Citrus Red No. 2, FDA proposes to not enforce applicable requirements of a final order with regard to food products manufactured (domestically and internationally) until one year after the effective date of that final order. We request comments on whether to provide such a compliance period and the appropriate duration.

## IV. Analysis of Environmental Impact

We have determined under 21 CFR 25.32(m) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment (Ref. 2). Therefore, neither an environmental assessment nor an environmental impact statement is required.

## V. Paperwork Reduction Act of 1995

FDA tentatively concludes that this proposed order contains no collection of information. Therefore, clearance by the Office of Management and Budget under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520) is not required.

## VI. References

The following references are on display at the Dockets Management Staff (see **ADDRESSES**) and are available for viewing by interested persons between 9 a.m. and 4 p.m., Monday through Friday; they also are available electronically at *https:// www.regulations.gov.* Although FDA verified the website addresses in this document, please note that websites are subject to change over time.

1. Memorandum from S. West-Barnette, Division of Food Ingredients, Regulatory Review Branch, Human Foods Program, FDA, to M. Honigfort, Division of Food Ingredients, Regulatory Management Branch, Human Foods Program, FDA, June 26, 2026.
2. Memorandum from M. Pfeil, Environmental Review Team, Office of Pre-Market Additive Safety, Human Foods Program, FDA, to S. West-Barnette, Division of Food Ingredients, Regulatory Review Branch, Human Foods Program, FDA, June 26, 2026.

## List of Subjects in 21 CFR Part 74

Color additives, Cosmetics, Drugs.

Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs, we propose to amend 21 CFR part 74 as follows:

## PART 74—LISTING OF COLOR ADDITIVES SUBJECT TO CERTIFICATION

■ 1. The authority citation for part 74 continues to read as follows:

**Authority:** 21 U.S.C. 321, 341, 342, 343, 348, 351, 352, 355, 361, 362, 371, 379e.

### § 74.302   [Removed]

■ 2. Remove § 74.302.

**Grace R. Graham,**
*Deputy Commissioner for Policy, Legislation, and International Affairs.*
[FR Doc. 2026–14909 Filed 7–22–26; 8:45 am]
**BILLING CODE 4164–01–P**

---

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### 29 CFR Part 1602

**RIN 3046–AB37**

### Removal of Reporting Requirements

**AGENCY:** Equal Employment Opportunity Commission.
**ACTION:** Proposed rule; public hearing.

---

**SUMMARY:** The Equal Employment Opportunity Commission (''EEOC'' or ''Commission'') is issuing a proposed rule to rescind and remove the requirements for the filing of the EEO– 1, EEO–2, EEO–3, EEO–4, EEO–5, and EEO–6 reports, and the recordkeeping and record preservation requirements related to these reports, under 29 CFR part 1602 because it has preliminarily determined that the reports are inconsistent with equal employment opportunity law and potentially unconstitutional. It further finds the data collected is not narrowly tailored, is unnecessary to enforce anti-discrimination laws, and at a minimum, that any marginal benefits are outweighed by the substantial burdens imposed on both employers, who must submit these reports annually regardless of any specific allegation or indication of a potential violation of the statutes the EEOC enforces, as well as the Commission. As part of this proposed rule, the Commission also reminds stakeholders that, in a notice of proposed rulemaking issued on November 21, 2024, the Commission proposed incorporating into part 1602 references to the Pregnant Workers Fairness Act. In the interest of

---

[1] On April 17, 1959 (24 FR 2945), we published a temporary listing for the use of Citrus Red No. 2.

**Federal Register**/Vol. 91, No. 140/Thursday, July 23, 2026/Proposed Rules **46333**

efficiency, the Commission currently intends to include these previously proposed part 1602 revisions in the final rule issued at the conclusion of this rulemaking.

**DATES:** Comments regarding this proposal must be received by the Commission on or before August 24, 2026. A public hearing concerning this proposal will be held on August 11, 2026 at 10:00 a.m. To request an opportunity to testify at the hearing, please submit a written request no later than August 7, 2026. Please see the sections below entitled **ADDRESSES** and **SUPPLEMENTARY INFORMATION** for additional information on submitting comments and requests to testify.

**ADDRESSES:** You may submit comments and requests to testify, identified by Regulatory Information Number (RIN) number 3046–AB37, by any of the following methods:

• *Federal eRulemaking Portal:* https://www.regulations.gov. Follow the instructions for submitting comments.

• *Fax:* 202–663–4114. Only comments or requests to testify of six or fewer pages will be accepted via FAX transmittal, in order to assure access to the equipment. Receipt of FAX transmittals will not be acknowledged, except that the sender may request confirmation of receipt by calling the Executive Secretariat staff at 202–921–2815 (voice), 1–800–669–6820 (TTY), or 1–844–234–5122 (ASL video phone).

• *Mail:* Raymond Windmiller, Executive Officer, Executive Secretariat, U.S. Equal Employment Opportunity Commission, 131 M Street NE, Washington, DC 20507.

• *Hand Delivery/Courier:* Raymond Windmiller, Executive Officer, Executive Secretariat, U.S. Equal Employment Opportunity Commission, 131 M Street NE, Washington, DC 20507.

*The hearing location is:* U.S. Equal Employment Opportunity Commission, 131 M Street NE, Jacqueline A. Berrien Training Center, Washington, DC 20507.

*Instructions:* The Commission invites comments and requests to testify from all interested parties. All comment submissions must include the agency name and docket number or the RIN for this rulemaking. Comments need to be submitted in only one of the above-listed formats. All comments received will be posted without change to *https://www.regulations.gov,* including any personal information you provide. However, the EEOC reserves the right to refrain from posting libelous or otherwise inappropriate comments, including those that contain obscene, indecent, or profane language; that

contain threats or defamatory statements; that contain derogatory speech directed at race, color, sex, national origin, religion, age, disability, or genetic information; or that promote or endorse services or products.

*Docket:* For access to the docket to read background documents, public comments received by the EEOC, or a plain language summary of the rule, go to *https://www.regulations.gov* and search for "EEOC" and "RIN 3046–AB37." The received comments will also be available for review on a computer in the Commission's Headquarters library, 131 M Street NE, Suite 4NW08R, Washington, DC 20507, between the hours of 9:00 a.m. and 4:30 p.m. on days the Commission is open for business, from August 24, 2026 until the Commission publishes the rule in final form. You must make an appointment with library staff to review the comments in the Commission's library by contacting 202–921–3119.

**FOR FURTHER INFORMATION CONTACT:** Kimberly Essary, Associate Legal Counsel, Office of Legal Counsel at 202–921–3152 (voice), 1–800–669–6820 (TTY), *kimberly.essary@eeoc.gov.* Requests for this notice of proposed rulemaking in an alternative format should be made to the Office of Communications and Legislative Affairs at 202–921–3191 (voice), 1–800–669–6820 (TTY), or 1–844–234–5122 (ASL video phone).

**SUPPLEMENTARY INFORMATION:**

## I. Introduction

Section 709(c) of title VII of the Civil Rights Act of 1964 ("Title VII") requires employers, labor organizations, and employment agencies to: "(1) make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports therefrom as the Commission shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of [Title VII] or the regulations or orders thereunder." [1] 42 U.S.C. 2000e–8(c).

---

[1] The only recordkeeping, record preservation, or reporting requirement that Congress mandated the EEOC adopt is with respect to apprenticeship recordkeeping. Section 709(c) mandates that the Commission require, by regulation, that employers, labor organizations, and joint labor-management committees that control apprenticeship or other training programs "maintain such records as are reasonably necessary to carry out the purposes of [Title VII]," including the names of applicants to such programs in the chronological order in which they were received. This recordkeeping requirement is codified at 29 CFR 1602.20.

In 1966, shortly after the Commission began operations, it adopted the annual EEO–1 reporting requirement, the first of six reporting requirements ("EEO Reports") codified at 29 CFR part 1602. 31 FR 2832, 2833 (Feb. 17, 1966) (codified at 29 CFR 1602.7). The EEO–1 report was adopted for joint use by the EEOC and the Office of Federal Contract Compliance Programs ("OFCCP"), which the Secretary of Labor had established to implement Executive Order ("E.O.") 11246, issued September 24, 1965. 30 FR 14658, 14658 (Nov. 25, 1965) (proposed rule); 31 FR 2832 (Feb. 17, 1966) (final rule).[2] At that time, the EEO–1 report required private employers with 100 or more employees and certain federal contractors with 50 or more employees and holding at least $50,000 in federal contracts to report the total number of employees, broken down by sex, in each of nine occupational categories, and the number of employees in each of four "minority" groups, broken down by sex, in each of the nine occupational categories. 30 FR at 14658–59. The categories of demographic data the EEO–1 report required originated in Standard Form 40, which the former President's Committee on Equal Employment Opportunity had previously used. *Id.* at 14658.

The Commission subsequently adopted five additional reporting requirements:

○ The EEO–2, codified at 29 CFR 1602.15, requires certain joint labor-management committees that control apprenticeship programs to annually report the number of applicants to, and participants in, apprenticeship programs by race/ethnicity and sex.[3] 32 FR 2852, 2853 (Feb. 14, 1967) (proposed rule); 32 FR 10650 (July 20, 1967) (final rule).

○ The EEO–3, codified at 29 CFR 1602.22, requires certain labor organizations to biennially report

---

[2] In January 2025, President Trump issued E.O. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," which revoked E.O. 11246 and directed OFCCP to cease certain compliance activities. E.O. 14173, 90 FR 8633, 8634 (Jan. 21, 2025). In July 2025, the Department of Labor determined that, under E.O. 14173, it must rescind its regulations promulgated under E.O. 11246, and issued a proposed rule rescinding those regulations, including the 41 CFR part 60–1 regulations that contain the EEO–1 reporting requirement. 90 FR 28472, 28473–74 (July 1, 2025).

[3] The Commission discontinued its collection of the EEO–2 report in 1981, when the Office of Management and Budget disapproved the EEOC's request to revise the EEO–2. *See* Notice of Office of Management and Budget Action from James J. Tozzi, Deputy Administrator, Office of Information and Regulatory Affairs, to EEOC (May 28, 1981), *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=198103-3046-001.*

**46334**    **Federal Register** / Vol. 91, No. 140 / Thursday, July 23, 2026 / Proposed Rules

membership, applicant, and job referral data by race/ethnicity and sex. 32 FR 2852, 2853 (Feb. 14, 1967) (proposed rule); 32 FR 10650 (July 20, 1967) (final rule).

○ The EEO–4, codified at 29 CFR 1602.32, requires certain state and local governments to biennially report the number of employees according to specified job categories and salary bands by race/ethnicity and sex. 38 FR 5659 (Mar. 2, 1973) (proposed rule); 38 FR 12604 (May 14, 1973) (final rule).

○ The EEO–5, codified at 29 CFR 1602.41, requires certain elementary and secondary school systems and districts to biennially report the number of employees in each of nineteen activity assignment classifications by race/ethnicity and sex. 38 FR 15461 (June 12, 1973) (proposed rule); 38 FR 26719 (Sept. 25, 1973) (final rule).

○ The EEO–6, codified at 29 CFR 1602.49, requires certain institutions of higher education to biennially report the number of employees according to specified occupational activities, salary classes, and/or ranks by race/ethnicity and sex.[4] 39 FR 16157 (May 7, 1974) (proposed rule); 40 FR 25188 (June 12, 1975) (final rule).

In addition to requiring the filing of the EEO Reports, the Commission has adopted recordkeeping and record preservation requirements related to the specific information needed to complete the reports. For example, section 1602.30 requires political jurisdictions with 15 or more employees to ''make or keep records and the information therefrom which are or would be necessary for the completion of report EEO–4 under the circumstances set forth in the instructions thereto, whether or not the political jurisdiction is required to file such report.'' *See also, e.g.,* 29 CFR 1602.39 (requiring public elementary and secondary schools to make or keep records needed to complete EEO–5 reports).[5]

Since the time that the Commission first required the submission of EEO Reports under Title VII, Congress expanded the Commission's authority to adopt reporting requirements when it passed the Americans with Disabilities Act of 1990 (''ADA''), the Genetic Information Nondiscrimination Act of 2008 (''GINA''), and the Pregnant Workers Fairness Act of 2022 (''PWFA''). *See* 42 U.S.C. 12117(a) (ADA—incorporating ''powers, remedies, and procedures'' in section 709 of Title VII, among others); 42 U.S.C. 2000ff–6(a)(1) (GINA—incorporating ''powers, remedies, and procedures'' in section 709 of Title VII, among others); 42 U.S.C. 2000gg–2(a)(1) (PWFA—incorporating ''powers, remedies, and procedures'' in section 709 of Title VII, among others). However, the Commission has never revised part 1602 to adopt reporting requirements under the ADA, GINA, or the PWFA.

To make other changes to the data collected in the EEO Reports, the EEOC has typically relied on the Paperwork Reduction Act (''PRA''). Because the EEO Reports involve the ''collection of data,'' they are covered by the PRA and require clearance by the Office of Management and Budget (''OMB'').[6] 44 U.S.C. 3501–21; *see also* Gen. Servs. Admin., *A Guide to the Paperwork Reduction Act, https://pra.digital.gov* (last visited June 23, 2026). PRA clearance is valid for up to three years. 44 U.S.C. 3507(g). For example, in late 2005, the EEOC issued a PRA notice that it was changing the preferred method of identifying an employee's race for EEO–1 reporting purposes from the employer's visual observation to the employee's own self-identification; added a ''Two or More Races—(Not Hispanic or Latino)'' category to the list of race and ethnic categories; and subdivided the ''officials and managers'' job category. 70 FR 71294, 71296, 71299 (Nov. 28, 2005). In 2016, the EEOC issued a PRA notice that it was revising the EEO–1 to add ''Component 2,'' which required employers to report pay data. 81 FR 5113 (Feb. 1, 2016). The EEOC subsequently determined that the ''significant burden'' imposed by the pay data collection was not justified by its ''practical utility'' and therefore omitted Component 2 when it sought renewal of the EEO–1 reporting requirement and reverted to requiring only demographic data (Component 1). 85 FR 16340, 16347 (Mar. 23, 2020).

As explained below, the Commission has now preliminarily determined that it should rescind the remaining reporting requirements under the EEO–1 and other EEO Reports. The Commission is not required to impose these reporting requirements on regulated entities, and it lies within the Commission's discretion to eliminate them if they are inconsistent with the law, no longer useful to enforce anti-discrimination laws, or counter to the EEOC's enforcement priorities.[7] Although the Commission has, in the past, made limited changes to the EEO Reports by relying on the PRA clearance process, the proposed complete rescission of the EEO Reports would require that the relevant provisions be removed from 29 CFR part 1602 to avoid public confusion about covered entities' reporting obligations, among other reasons. Because the Commission is proposing to rescind the EEO reporting requirements, it is also proposing to rescind the recordkeeping and record preservation requirements associated with the EEO Reports. This proposed action is consistent with the policy underlying E.O. 14192, ''Unleashing Prosperity Through Deregulation,'' that agencies must be ''prudent and financially responsible in the expenditure of funds . . . to alleviate unnecessary regulatory burdens placed on the American people.'' 90 FR 9065 (Feb. 6, 2025).

## II. Reasons

### A. Conflict With EEO Law and U.S. Constitution

While the Commission often will need to request information related to employees' protected characteristics in the context of a particular charge or lawsuit, the Commission has preliminarily concluded that wholesale collection of such information through the EEO Reports—unconnected to any specific allegation of discrimination—may hinder effective enforcement of the

---

[4] The Commission discontinued its collection of EEO–6 data in 1993 when the U.S. Department of Education began collecting data reported on the EEO–6 for post-secondary education through the annual Integrated Postsecondary Education Data System (IPEDS) Staff Survey. *See* Elise M. McNeely, U.S. Department of Education, *The History and Origins of Survey Items for the Integrated Postsecondary Education Data System (2022–23 Update),* at 4 n.5, HR–1 (NPEC 2023), *https:// nces.ed.gov/ipeds/pdf/NPEC/data/The-History-and-Origins-of-Survey-Items.pdf.*

[5] The Commission also has promulgated broadly worded record preservation provisions that are not tied to the EEO Reports. *E.g.,* 29 CFR 1602.14, 1602.31, 1602.40. The Commission is not proposing the rescission of these general record preservation requirements.

[6] Pursuant to the PRA, an agency must publish an initial notice in the **Federal Register** soliciting public comment and explaining, among other things, the specific data that will be collected and the estimated burden imposed on the public by the collection. *See, e.g.,* 68 FR 34965 (June 11, 2003) (proposing changes to data collected through the EEO–1 report). After the public comment period has closed, the agency publishes a final notice addressing public comments in response to the initial notice and submits the proposed collection to OMB for review. *See, e.g.,* 70 FR 71294 (Nov. 28, 2005) (final notice addressing public comments received in response to initial notice of June 11, 2003).

[7] Some of the provisions in part 1602 have long been inconsistent with the accompanying instructions for the various EEO reports, including many of the filing deadlines, as well as § 1602.13, which allows employers to acquire race data ''either by visual surveys of the work force, or at their option, by the maintenance of post-employment records as to the identity of employees where the same is permitted by State law.'' In addition, the EEOC has not required the submission of either the EEO–2 report or the EEO–6 report for many decades. These provisions would need to be rescinded through formal rulemaking even if the EEOC continued to require the other EEO reports.

EEO laws, and even more significantly, may violate the U.S. Constitution.

Under the Constitution, government actions that classify individuals on the basis of race are subject to "strict scrutiny," and therefore must be "narrowly tailored" to advance a "compelling governmental interest." *See, e.g., Louisiana* v. *Callais,* 146 S. Ct. 1131, 1161 (2026); *Students for Fair Admissions, Inc.* v. *President & Fellows of Harv. Coll.,* 600 U.S. 181, 206–07 (2023) (*SFFA*). The constitutional guarantee of equal protection is universal and not restricted to certain favored groups. *See SFFA,* 600 U.S. at 206 ("Eliminating racial discrimination means eliminating all of it."); *Adarand Constructors, Inc.* v. *Pena,* 515 U.S. 200, 227 (1995) (concluding that because the Constitution protects persons, not groups, a race-based classification "should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection has not been infringed"). The Constitution makes no exception for so-called "benign" classifications. *See City of Richmond* v *J.A. Croson Co.,* 488 U.S. 469, 493 (1989) (plurality opinion) (explaining that a "searching judicial inquiry" is needed to determine whether a so-called "benign" classification is "motivated by illegitimate notions of racial inferiority"); *see also SFFA,* 600 U.S. at 257 (Thomas, J., concurring) ("History has repeatedly shown that purportedly benign discrimination may be pernicious, and discriminators may go to great lengths to hide and perpetuate their unlawful conduct."); *id.* at 266 (discussing historical reliance on supposedly benign motives to justify racially discriminatory policies, including Black Codes and "discriminatory and destructive social welfare programs"); *id.* at 271 (stating that "it is not even theoretically possible to 'help' a certain racial group without causing harm to members of other racial groups"). Racial classifications are subject to strict scrutiny even if they arguably "burden or benefit the races equally." *Shaw* v. *Reno,* 509 U.S. 630, 651 (1993). Because the EEO Reports are imposed on regulated entities by federal regulation and require them to adopt race-based classifications, they must satisfy these stringent constitutional requirements. *See Ricci* v. *DeStefano,* 557 U.S. 557, 594 (2009) (Scalia, J., concurring) (stating that if the federal government is prohibited from engaging in race discrimination, "then surely it is also prohibited from enacting laws mandating that third parties . . . discriminate on the basis of race (citing

*Buchanan* v. *Warley,* 245 U.S. 60, 78–82 (1917))).

As explained below, the Commission has preliminarily determined that the EEO Reports are inconsistent with EEO law because they may encourage employers to discriminate against employees who are not considered "minorities," may promote racial stereotyping, and may encourage employers to engage in discrimination to avoid potential EEOC enforcement actions or to address perceived inequitable outcomes.[8] Additionally, requiring all employers with 100 or more employees to indiscriminately submit racial and sex demographic data to the federal agency responsible for enforcing anti-discrimination laws, absent any underlying charge or allegation of unlawful discrimination, is not narrowly tailored. In contrast, the EEOC's primary source of investigatory information to support its enforcement efforts—such as agency requests from a particular employer during a charge investigation for specific "records relevant to the determinations of whether unlawful employment practices have been or are being committed," 42 U.S.C. 2000e–8(c)—are narrowly tailored to specific alleged violations of federal employment anti-discrimination laws arising from a particular charge of discrimination. For avoidance of doubt, this proposed rescission concerns only the routine mass collection of demographic information through mandatory EEO Reports to the EEOC, without regard to and unconnected with any underlying charge or allegation of unlawful discrimination; it does not concern requests for records relevant to determining whether unlawful employment practices have been or are being committed by a particular employer during a charge investigation. Because the EEO Reports compel employers to classify employees by race and sex and cannot be justified to support the EEOC's enforcement efforts, they may violate equal protection guarantees under the U.S. Constitution.[9]

---

[8] Consistent with these conclusions, the Commission is revising 29 CFR 1602.20(b)–(c) to remove recordkeeping categorizations based on race and sex and conforming section 1602.20 to the minimum apprenticeship recordkeeping requirements imposed on the Commission by Title VII Section 709(c). *See infra* Section IV.

[9] The Commission recognizes that, unlike race-based classifications, sex-based classifications are subject to intermediate scrutiny under the Constitution. *See United States* v. *Skrmetti,* 605 U.S. 495, 510 (2025) (contrasting strict scrutiny (race, alienage, national origin) and intermediate scrutiny (sex) with rational basis review). However, given that the collection of sex data in the EEO Reports suffers from many of the same kinds of problems as the collection of race data, *e.g.,* stereotyping and the lack of a connection to an

1. Impermissible Focus on "Minorities" and Women

When the EEO Reports were first adopted, Title VII was only a few years old. *See* 31 FR 2832 (Feb. 17, 1966) (codified at 29 CFR 1602.7). The statute had been passed to address entrenched and widespread discriminatory practices that permeated American workplaces and denied millions of workers the same opportunities as others merely because of their race or sex or some other factor unrelated to job performance. *See* 110 Cong. Rec. 7247 (1964) ("[T]he very purpose of [T]itle VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color."). The EEO Reports were born of their time. They were adopted in large part as a way to monitor and track progress toward achieving the mandate of workplaces free of discrimination. *See* EEOC, *Equal Employment Opportunity Report 1966 Part I,* "The Many Faces of Discrimination" (1966) ("Equal Employment Report No. 1 marks the first attempt by the Equal Employment Opportunity Commission to measure the impact of discrimination in employment on minority groups and women."). For nearly a decade, the only racial categories that employers were required to report were for four designated "minority groups" ("Negro," "Oriental," "American Indian," and "Spanish American"), and the race and ethnicity of other workers were not tracked. By the late 1970s, the EEO Reports had been modified to require employers to identify all employees by race, not only "minority" employees. EEOC, *Equal Employment Opportunity Report 1978, Job Patterns for Minorities and Women in Private Industry,* Appendix (1978). However, the focus on potential discrimination against "minorities" persisted, and for over forty years, the Commission continued to issue annual reports of aggregate data titled "Job Patterns for Minorities and Women in Private Industry."

The EEOC also narrowly focused on discrimination against minorities and women in the since rescinded *Guidelines on Affirmative Action Appropriate Under Title VII of the Civil Rights Act of 1964, As Amended* (1979) ("Guidelines"). 29 CFR part 1608. In adopting the Guidelines, the Commission described Title VII as intended to "improve employment opportunities for minorities and women," rather than describing it as intended to prohibit race and sex

---

ongoing charge or investigation, the Commission believes that requiring employers to collect and report sex data also may violate the Constitution.

discrimination against all workers, regardless of their race or sex. 29 CFR 1608.1(a). Thus, although the EEOC acknowledged that "[t]here is no separate concept under Title VII of 'reverse discrimination,' " 44 FR 4422, 4422 (Jan. 19, 1979), it adopted the Guidelines to "encourage[ ] and protect[ ]" employment opportunities specifically for minorities and women.[10] 29 CFR 1608.1(c). In 2006, citing the Guidelines in the Compliance Manual Section on Race and Color Discrimination, the then-Commission reaffirmed its support for race-based affirmative action, but once again, only with respect to "racial minorities." *See* EEOC, *Section 15: Race and Color Discrimination* § 15–VI.C (2006), *https:// www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination#VIC* ("The Commission encourages voluntary affirmative action and diversity efforts to improve opportunities for racial minorities in order to carry out the Congressional intent embodied in Title VII.").

Until 2025, multiple federal courts of appeals had relied on this distinction between so-called "minority-group" and "majority-group" plaintiffs in holding that majority-group plaintiffs (*e.g.,* men and White individuals) must satisfy a heightened background circumstances test in order to establish a prima facie case of disparate treatment under the framework in *McDonnell Douglas* v. *Green,* 411 U.S. 792 (1973). *See* Brief for the United States as Amicus Curiae in Support of Vacatur at 20–21, *Ames* v. *Ohio Dep't of Youth Servs.,* 605 U.S. 303 (2025) (citing cases from Sixth, Seventh, Eighth, Tenth, and D.C. Circuits that apply a heightened background circumstances test).

Rejecting this heightened test, the Supreme Court held in *Ames* v. *Ohio Department of Youth Services* that Title VII's disparate-treatment provision prohibits discrimination against any "individual," thus "establishing the same protections for every 'individual'—without regard to that individual's membership in a minority or majority group." 605 U.S. 303, 309–10 (2025); *see also McDonald* v. *Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280 (1976) (holding that Title VII prohibits discrimination against White individuals "upon the same standards" as Black individuals).

To be sure, the EEOC has long rejected the use of a heightened background circumstances test. *See* EEOC, *Section 15 Race and Color Discrimination* § 15–II n.23 & accompanying text (2006), *https:// www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination.*

Nonetheless, by focusing attention on "minority" employees, the EEO Reports potentially conflict with *Ames* by requiring regulated entities to force all employees into a small number of predetermined race/ethnic categories. As explained in the instructions for completing the 2024 EEO–1 report, the "designations do not control who is protected by Title VII's prohibitions against employment discrimination based on race or national origin." EEOC, *2024 EEO–1 Component 1 Data Collection Instruction Booklet* 15 n.41. However, the predetermined categories, by their nature, only permit comparisons between members of different groups (*e.g.,* Asian individuals and White individuals), rather than between members of the purportedly same group (*e.g.,* Koreans and Indians). Moreover, despite the qualifying statement that these "designations do not control," they may effectively guide how employers, employees, and even the EEOC look for potential discrimination under Title VII, to the exclusion of the myriad other forms of discrimination than can, and do, exist. As a result, combatting discrimination against members of the predetermined categories is prioritized over combatting discrimination involving other categories, contrary to the *Ames* principle that Title VII prohibits discrimination against "individuals," 42 U.S.C. 2000e–2(a)(1), and that the same protections apply regardless of the particular group to which someone belongs. *See also Ricci* v. *DeStefano,* 557 U.S. 557, 608 (2009) (Alito, J., concurring) (stating that White and Hispanic firefighters who challenged the defendant city's decision to throw out the results of a firefighters promotional examination had a "right to demand . . . evenhanded enforcement of the law—of Title VII's prohibition against discrimination based on race").

Whatever the merits of the initial justifications for the EEO Reports, the Commission believes that the atextual approach that frames discrimination based on pre-determined racial and ethnic categories and the dichotomy between minority and majority groups is no longer sustainable. *Cf. SFFA,* 600 U.S. at 212 (concluding that a "race conscious" college admissions program must have an "end point"); *id.* at 314 (Kavanaugh, J. concurring) (stating that

in *Grutter,* the Court did not exempt college admissions from the requirement that "all governmental use of race must have a logical end point" and that this requirement "assures all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter" (quoting *Grutter* v. *Bollinger,* 539 U.S. 306, 342 (2003))).

2. Racial Categories Are Not Grounded in EEO Law, and They Promote Stereotyping

Over the nearly 60 years that the EEOC has required the submission of the EEO Reports, the EEOC has repeatedly revised and re-defined the racial and ethnic categories that employers are required to report. Given the reasonable concerns that employers and employees may have about identifying employees by race, the EEOC has a duty to ensure that the racial categories reflect its enforcement needs. *See* Gregory Taylor & Christopher Weeks, Note, *Compelled Identity: EEOC Policy to Reclassify Ethnicity as a Free Speech Violation,* 70 a.m. U. L. Rev. F. 37, 59–60 (2020) (noting that employer objections to race classifications could include staff morale and avoiding potential EEO litigation and employee objections to race classifications could include the belief that they may be subject to discrimination or that the issue is a private matter). The EEOC cautions filers that the "race/ethnic designations, as used by the EEOC for the EEO–1 Component 1 report, do not denote scientific definitions of anthropological origins." EEOC, *Job Patterns for Minorities and Women in Private Industry,* Employer Information Report (EEO–1), Standard Form 100 (2003). What then are these categories based on? As the Supreme Court has observed, such racial categories are frequently "arbitrary," "overbroad," and/or "underinclusive." *SFFA,* 600 U.S. at 216. They are established by bureaucrats motivated by political considerations and "have become only more incoherent with time." *Id.* 291–92 (Gorsuch, J., concurring) (comparing cases in which Hispanic status was denied to an individual of Italian-Argentine descent and another individual with one Mexican grandparent but granted to a "Sephardic Jew whose ancestors fled Spain centuries ago"). Moreover, regardless of whether they are so intended, these classification systems are used to "sor[t] out winners and losers." *Id.* at 291 (quoting H. Graham, *The Origins of Official Minority Designation,* in *The New Race Question: How the Census Counts Multiracial Individuals* 289 (J.

---

[10] Similarly, OFCCP regulations implementing E.O. 11246 require certain federal contractors to engage in "affirmative action" to address the "underutilization" of women and minorities. 41 CFR 60–2.10. Because President Trump rescinded E.O. 11246, OFCCP has also proposed the rescission of the implementing regulations. *See supra* note 2.

Perlmann & M. Waters eds. 2002)); *see also* Alex Nowrasteh, *The Consequences of a Middle Eastern or North African (MENA) Survey Question,* CATO Institute (Sept. 28, 2023), *https://www.cato.org/briefing-paper/consequences-middle-eastern-or-north-african-mena-survey-question* (stating that ''Arab American organizations began lobbying the U.S. Census Bureau in the 1980s to create a new racial category for Arab or Middle Eastern Americans to increase their political influence and, perhaps, eventually benefit from affirmative action'').

Such considerations do not reflect the EEOC's enforcement needs, yet they can be seen in the Commission's decisions about how an employee's race should be determined.[11] For example, when the EEO–1 Report was adopted, filers were instructed to identify an employee's race or ethnicity by visual observation, and ''direct inquiry [was] not encouraged.'' 30 FR at 14660. The employer could include an employee in the ''minority group to which he or she appears to belong, or is regarded in the community as belonging.'' *Id.* According to Herbert Hammerman, the EEOC's Chief of Reports at the time, relying on visual observation was necessary to ''appeas[e]'' the NAACP. Clark D. Cunningham et al., *Passing Strict Scrutiny: Using Social Science to Design Affirmative Action Programs,* 90 Geo. L.J. 835, 863 (2002). Four decades later, the Commission made an about-face, telling employers that self-identification was now the ''preferred method for gathering ethnic and racial information for the EEO–1 Report.'' 70 FR 71294, 71296 (Nov. 28, 2005).[12] The Commission described the change as ''key to the government's goal of understanding the increasing

---

[11] The Commission's views are limited to its own use of racial and ethnic categories for EEO enforcement purposes and do not extend to other federal agencies' use in non-EEO contexts.

[12] Moreover, as discussed earlier, although voluntary self-identification is the Commission's ''preferred'' method for collecting race data, employers are still permitted to classify employees' race using other sources, such as observer identification or employment records when completing EEO reporting to the EEOC. Therefore, because every employee may ultimately be assigned a racial category for reporting purposes, the employee's only choice is *who* makes the classification to the government. The statutory scheme therefore encourages, if not compels, racial classification even when the individual objects. Because the government mandates racial classifications as a condition of employer compliance, the reporting regime constitutes governmental racial classification subject to strict scrutiny. While combating employment discrimination may be a compelling interest, a system that requires the government to assign racial identities to individuals who refuse to self-identify is arguably not narrowly tailored when less intrusive alternatives exist.

complexity of race in America,'' and rather bizarrely described the change not as enhancing EEO enforcement but merely as one that ''will not undermine civil rights.'' *Id.*

Changes to particular EEO categories also reflect that the categories are largely arbitrary and not based on the EEOC's enforcement needs.

○ The EEO Reports have always included an ''American Indian'' category. Curiously, this category was redefined in the late 1970s as limited to any persons with ''origins in any of the original peoples of North America, and who maintain cultural identification through tribal affiliation or community recognition.'' EEOC, *Equal Employment Opportunity Report 1978: Job Patterns for Minorities and Women in Private Industry,* Appendix (1978). Because of the tribal affiliation requirement, an individual's status as an ''American Indian'' turns in part on political considerations unrelated to EEO enforcement, and an individual with Native American origins but without a tribal affiliation falls outside any designated race/ethnic category regardless of how the employer views the individual or how he self-identifies.

○ A further example is the evolution of the category that includes Hispanic and Latino individuals. The first EEO–1 Report designated ''Spanish Americans'' as one of four ''minority'' groups and defined the group as meaning ''those of Latin American, Puerto Rican or Spanish origin.'' 30 FR at 14660. In the instructions for the 1975 EEO–1 Report, the group is labeled ''Spanish Surnamed Americans,'' and ''deemed to include all persons of Mexican, Puerto Rican, Cuban or Spanish origin.'' EEOC, *Equal Employment Opportunity Report 1975: Job Patterns for Minorities and Women in Private Industry,* Appendix (1975). There is no mention of whether this category includes other individuals of Latin American origin. In the instructions for the 1978 EEO–1 Report, the Commission relabeled the category ''Hispanic'' and reverted to a broad definition (''All persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race''). EEOC, *Equal Employment Opportunity Report 1978: Job Patterns for Minorities and Women in Private Industry,* Appendix (1978).

○ Individuals with origins in Southeast Asia or the Indian subcontinent, were not included in any of the minority groups in the first EEO-Report. 30 FR at 14658. In the instructions for the 1973 EEO–4 Report and 1974 EEO–5 Report, those individuals were included in the then-

newly added ''White'' racial category. EEOC, *Minorities and Women in State and Local Government: Federal Region I,* Appendix 2 (1973); EEOC, *Equal Opportunity in the Schools: Job Patterns for Minorities and Women in Public Elementary and Secondary Schools,* Appendix (1974). In the 1978 EEO–1 Report instructions, individuals with origins in Southeast Asia were moved to the category ''Asian or Pacific Islander.'' EEOC, *Job Patterns for Minorities and Women in the Private Sector,* Appendix (1978).

Viewing individuals as having inherent qualities based on racial stereotypes is antithetical to the Title VII requirement that employer actions be colorblind. Thus, in E.O. 14173, President Trump made it the policy of the United States to ensure that employment decisions are not based on discriminatory preferences but ''individual merit, aptitude, [and] hard work.'' 90 FR at 8633; *cf. SFFA,* 600 U.S. at 220 (concluding that respondents' race-based college admissions programs rested on ''pernicious stereotype that 'a black student can usually bring something that a white person cannot offer''' (quoting *Regents of Univ. of Cal.* v. *Bakke,* 438 U.S. 265, 316 (1978) (opinion of Powell, J.))).

Such stereotypes feature prominently in recent cases involving training and other employer-sponsored events purportedly intended to prevent discrimination. A particularly egregious example is *Chislett* v. *New York City Department of Education,* 157 F.4th 172 (2d Cir. 2025). In that case, the court vacated summary judgment for the employer in a racial harassment claim based largely on alleged comments during mandatory ''implicit bias'' training sessions. These included comments by instructors that ''white colleagues must take a step back and yield to colleagues of color''; and ''white culture's values'' are ''homogenous and supremacist.'' *Id.* at 180. When the plaintiff, an educator, opted not to participate in a training session in which participants were instructed to list ''white values'' on a poster, another participant called her a ''horrible person,'' and a facilitator told participants that if they did not ''stand up'' to ''people who disagree with these views about white supremacist values, children's lives would be at stake.'' *Id.* Not surprisingly, the pernicious stereotypes perpetuated in these training sessions affected day-to-day workplace interactions. For example, at a meeting at which the plaintiff asked a Black subordinate why she was late for a meeting she was supposed to help lead, the subordinate accused the

plaintiff of making a ''race-based judgment'' and said she could ''not be trusted.'' The next week, referring back to this incident, the subordinate admonished the plaintiff, ''How dare you approach me out of your white privilege.'' *Id.; see also, e.g., Diemert* v. *City of Seattle,* 776 F. Supp. 3d 922, 941 (W.D. Wash. 2025) (alleged racial harassment included statements by a trainer that ''the real truth is that all white people are cannibals[,]'' ''racism is in white people's DNA[,]'' and ''white people are like the devil''); *Johnson* v. *Or. by and though Or. Dep't of Env't Quality,* No. 3:24–cv–002979, 2024 WL 5038803, at *4 (D. Or. Dec. 9, 2024) (alleged racial harassment included mandatory training that ''ascribed negative traits to white people without exception and as flowing from race'' and comments from coworkers that ''white employees' accomplishments result from 'unearned privilege,' '' ''white voices are not worth listening to,'' and ''discrimination against white people is legitimate'').

3. Misuse of Data

The Commission also has concerns that demographic data may be subject to misuse. As widely recognized by federal courts, a statistical imbalance may have an innocuous explanation and not be probative of discrimination, standing alone. *See, e.g., Grant* v. *City of Blytheville,* 841 F.3d 767, 775 (8th Cir. 2016) (''[F]or statistical evidence to be probative . . . , it must analyze the treatment of comparable employees.'' (quoting *Evers* v. *Alliant Techsystems, Inc.,* 241 F.3d 948, 958 (8th Cir. 2001))); *Ford* v. *Jackson Nat'l Life Ins. Co.,* 45 F.4th 1202, 1217 (10th Cir. 2022) (''Statistics taken in isolation are generally not probative of . . . discrimination.'' (quoting *Jones* v. *Unisys Corp.,* 54 F.3d 624, 632 (10th Cir. 1995))); *Matthews* v. *Waukesha Cnty.,* 759 F.3d 821, 830 (7th Cir. 2014) (holding that the district court properly concluded that the ''probative value of the [the plaintiff's] statistical evidence was limited because of its broad scope''). Nevertheless, regulated entities may mistakenly believe that the EEOC will target them for enforcement actions based on statistical imbalances and therefore take discriminatory actions to correct those imbalances in violation of EEO law. *See Texas* v. *EEOC,* 933 F.3d 433, 447 (5th Cir. 2019) (concluding that EEOC guidance imposed a regulatory burden on Texas that ''pressured'' it to change its policy to avoid enforcement actions); *see also Watson* v. *Fort Worth Bank & Trust,* 487 U.S. 977, 933 (1988) (plurality opinion) (explaining that, although use of quotas and preferential

treatment may be unlawful, employers may adopt them as a ''cost-effective means of avoiding expensive litigation and potentially catastrophic liability''). Alternatively, employers may use the data to address perceived inequities, misunderstanding that Title VII does not provide equal outcomes, only equal opportunity. *See* E.O. 14173, 90 FR at 8633 (noting that ''critical and influential institutions of American society, including the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation''); *cf. Louisiana* v. *Callais,* 146 S. Ct. 1131 (2026) (concluding that the term ''opportunity'' in section 2(b) of the Voting Rights Act (''VRA'') ''must mean a *chance* to achieve a desired result, because the [VRA] does not guarantee equal outcomes'').

The Supreme Court has made clear that EEO law does not make an exception for actions based on race or other protected characteristics that are ''well intentioned or benevolent.'' *Ricci* v. *DeStefano,* 557 U.S. 557, 579–80 (2009). In other words, Title VII's protections do not carve out exceptions for employers to take race-based actions to benefit some employees at the expense of others. *Cf. Parents Involved in Cmty. Schs.* v. *Seattle Sch. Dist. No. 1,* 551 U.S. 701, 748 (2007) (Equal Protection case) (''The way to stop discrimination on the basis of race is to stop discriminating on the basis of race.''). In recent cases, courts have held that employers violate EEO law by taking actions based on protected characteristics in order to address the underrepresentation of women or particular racial or ethnic groups. *See Duvall* v. *Novant Health, Inc.,* 95 F.4th 778, 788–91 (4th Cir. 2024) (holding that a reasonable jury could have found that a White male executive was fired based on his race and/or sex, where he was fired during an initiative to increase representation of women and Black individuals in leadership roles); *Dill* v. *Int'l Bus. Machs. Corp.,* No. 1:24–cv–852, 2025 WL 913744 (W.D. Mich. Mar. 26, 2025) (denying motion to dismiss where a White male alleged he was fired even though he was performing his job well and IBM had set targets for racial and gender composition and provided

compensation incentives to executives to improve representation of women and minorities).

By requiring employers and other regulated entities to report statistical data related to sex and race/ethnicity, the Commission's EEO reporting requirement may have the unintended effect of promoting, rather than reducing, discrimination because of the mistaken view that it is permissible to take race and sex-based actions to correct statistical imbalances. On the other hand, an employer could mistakenly believe that the absence of a statistical imbalance means that it has not violated EEO law, causing the employer to forgo its responsibilities to prevent and correct discrimination. As the primary federal agency charged with enforcing the nation's EEO laws, the EEOC must exercise great care to ensure that its regulations do not undermine the effective operation of the EEO laws.

Recognizing that employer actions to address statistical imbalances are contrary to the ''bedrock principle of the United States . . . that all citizens are treated equally under the law,'' President Trump issued E.O. 14281, directing the EEOC and other federal agencies to ''deprioritize enforcement of all statutes and regulations to the extent they include disparate-impact liability.'' 90 FR 17537, 17537 (Apr. 23, 2025). Such actions, as with employer actions driven by race or sex-based stereotypes, ''hinder[ ] businesses from making hiring and other employment decisions based on merit and skill, their needs, or the needs of their customers.'' As explained in a Department of Justice opinion addressing the constitutionality of disparate-impact liability under Title VII, ''virtually *every* employment practice has at least some adverse impact on some protected group.'' 50 Op. O.L.C. (June 9, 2026) (slip op. at 20 n.13). As a result, employers may be pressured to engage in unlawful race-based decision making to address statistical disparities that could result in disparate-impact liability. *Id.* at 8–9. E.O. 14281 provides the Commission with further justification for rescinding the EEO Reports.

4. Potential Equal Protection Violation

As explained earlier, government-imposed racial classifications are themselves racial classifications and are subject to strict scrutiny. To be lawful, they must therefore be narrowly tailored and justified by a compelling governmental interest.

The Commission's authority to solicit reporting comes from section 709(c) of Title VII, but that authority is limited to ''records *relevant to* the determinations

of whether unlawful employment practices have been or are being committed.'' 42 U.S.C. 2000e–8(c) (emphasis added). Because the bulk of the EEO Reports data is not relevant to determining whether unlawful employment practices have occurred (because, as discussed, many employers do not have any race, national origin, or sex-based charge of discrimination or a related investigation against them in any particular year for which EEO Reports data might be relevant), *see supra* Section II.1–3, a compelling government interest does not justify the collection of that bulk of the data.

Even if a compelling government interest were to exist, the EEO Reports would still fail constitutional scrutiny because they are not narrowly tailored in the absence of a charge of discrimination or investigation. A charge of discrimination precedes a formal EEOC investigation. During an investigation, the Commission is authorized by Congress to obtain data from employers through a variety of means, including requests for information and subpoenas. This information is tailored to the specific allegations under EEOC investigation and is therefore better suited to assist the Commission in evaluating whether unlawful employment practices have occurred or are ongoing. The Commission views its investigative authority as a more reliable, narrowly tailored, and cost-effective tool to support its enforcement efforts.[13]

Since the EEO Reports mandate reporting requirements of race-based classifications and are not consistent with the Commission's enforcement of EEO law when not related to a charge or investigation, they potentially conflict with the constitutional guarantee of equal protection.[14]

---

[13] *See infra* Section II.3 (explaining that statistical imbalances alone may not be probative of unlawful employment practices); *see also, e.g., Tex. Dep't of Hous. & Cmty. Affs.* v. *Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 521 (2015) (''[S]erious constitutional questions . . . might arise . . . if . . . liability were imposed based solely on a showing of a statistical disparity.''); *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642, 643 (1989) (explaining that if any employer with a ''racially imbalanced segment of its work force'' can be ''haled into court and made to undertake the expensive and time-consuming task of defending'' itself, then ''the only practicable option'' for many employers ''would be the adoption of racial quotas, which has been rejected by [the Supreme] Court and by Congress''); *cf.* 42 U.S.C. 2000e-8(c) (requiring employers to maintain records that are ''*relevant* to the determinations of whether unlawful employment practices have been or are being committed'') (emphasis added).

[14] The Commission recognizes that courts have rejected some constitutional challenges to government data collections. For instance, in *Morales* v. *Daley,* 116 F. Supp. 2d 801, 815 (S.D. Tex. 2000), the court distinguished ''between

*B. Costly Burden on the Commission*

The EEO Reports require that the Commission devote a meaningful portion of its budget to administering the reporting. The Commission is a small agency with a small budget. Historically, most of the Commission's budget is committed to fixed costs primarily in the form of compensation and rent. For example, for Fiscal Year (FY) 2027, compensation and benefits, rent, and security will account for 80 percent of the agency's projected expenses. EEOC, *Fiscal Year 2027 Congressional Budget Justification* at 6 chart 1 (Mar. 2026), *https:// www.eeoc.gov/sites/default/files/2026- 04/Fiscal_Year_2027_Congressional_ Budget_Justification_-_508.pdf.* Another 7 percent of the Commission's 2027 budget is allocated to Information Technology expenses, and the remaining 13 percent is dedicated to ''Other Program Support,'' including, for example, operational support to the agency's 53 field offices and employee training. *Id.* Given these significant fixed costs, the Commission operates within very tight margins to fund the agency's other priorities.[15] In recent years, operating within these margins has become even more difficult since the Commission's enacted funding levels have been lower than the agency's budget requests to Congress. Therefore, the Commission must be incredibly strategic and fiscally prudent as to the

---

collecting demographic data so that the government may have the information it believes at a given time it needs in order to govern, and governmental use of suspect classifications without a compelling interest.'' Since the plaintiffs were challenging the mere collection of race data by the Census Bureau pursuant to its statutory authority, the court concluded that the issue presented was ''one properly addressed by Congress, not by the courts.'' *Id.* In the Commission's view, the collection of race data through the EEO Reports is distinguishable because, as explained in this notice of proposed rulemaking, the establishment of race categories in the reports is essentially an incoherent system of choosing ''winners and losers,'' thereby going beyond a mere data collection. *SFFA,* 600 U.S. at 291(Gorsuch, concurring) (quoting H. Graham, *The Origins of Official Minority Designation, in The New Race Question: How the Census Counts Multiracial Individuals* 289 (J. Perlmann & M. Waters eds. 2002)).

[15] For example, the EEOC estimates that in FY 2027 it will obligate up to $32,000,000 to compensate state and local Fair Employment Practices Agencies (FEPAs) for investigatory and other charge-related work, as well as funding for Tribal Employment Rights Offices (TEROs), which assist the agency with outreach and education for tribal members. The agency estimates another $6,000,000 will go to support the agency's non-fee-based outreach activities across the United States. *See* EEOC, *Fiscal Year 2027 Congressional Budget Justification* 6, 34 (Mar. 2026), *https:// www.eeoc.gov/sites/default/files/2026-04/Fiscal_ Year_2027_Congressional_Budget_Justification_-_ 508.pdf.*

activities the agency chooses to fund or not fund.

One of the activities the Commission has historically funded is the collection of EEO data from private employers, local unions, state and local governments, and public elementary and secondary school systems and districts. However, funding these data collections has imposed a significant financial burden on the agency. In the last five years alone, the Commission has incurred over $18,000,000 in federal contractor costs collecting these data— and this amount does not include the additional millions incurred in federal staffing costs. For example, in the Commission's most recent PRA Notice for the collection of EEO–1 data,[16] 88 FR 27504 (May 2, 2023), the Commission estimated that the federal cost to the agency to administer the EEO–1 would be $3,892,230 per year, of which $3,258,616 would be contractor costs. EEOC, *Supporting Statement A* at 15, OMB No. 3046–0049 (May 2, 2023), *https://www.reginfo.gov/public/do/ DownloadDocument?objectID= 131631701.* If considered in terms of the FY 2027 budget, this $3,258,616 amount for the EEO–1 data collection would represent approximately 6 percent of the agency's budget for ''Other Program Support.'' [17] However, the EEO–1 is only one of the data collections administered by the Commission. The agency also incurs contractor and federal staffing costs for the EEO–3, EEO–4, and EEO–5 data collections. For example, based upon estimates published in the most recent PRA Notices for the EEO–3, EEO–4, and EEO–5, the combined federal costs of these collections are approximately $1.2 million.[18] 89 FR 96968, 96969 (Dec. 6, 2024) (EEO–3); 89 FR 96963, 96963 (Dec 6, 2024) (EEO–4); 89 FR 96965, 96966 (Dec. 6, 2024) (EEO–5).

---

[16] This PRA Notice covers the collection of data by the EEOC for reporting years 2022, 2023, and 2024. 88 FR 27504 (May 2, 2023). The OMB clearance for this Notice expires on November 30, 2026. However, the agency has already completed its collection of the data for the three reporting years approved by this Notice (*i.e.,* 2022, 2023, 2024).

[17] The agency believes 6 percent likely underestimates the percentage of the Commission's FY 2027 budget that would be required to fund the EEO–1 given the $3,258,616 estimate was last calculated in 2023 for the most recent EEO–1 PRA Notice (*i.e.,* 88 FR 27506).

[18] Although the EEO–3, EEO–4, and EEO–5 data collections are much smaller and less expensive than the EEO–1, they still impose a cost on the agency. For example, under the prior presidential administration, the Commission did not field the 2024 EEO–3 and 2024 EEO–5 data collections due to the costs associated with these collections and the agency's need to reallocate funds to other priorities.

**46340**    **Federal Register** / Vol. 91, No. 140 / Thursday, July 23, 2026 / Proposed Rules

*C. Conclusion*

The Commission has proposed the rescission of portions of 29 CFR part 1602 that require regulated entities to file the EEO Reports and to keep (make) and preserve records related to those reports. It additionally proposes to remove recordkeeping categorizations based on race and sex, while retaining the need for employers to keep records of their employment actions generally. As explained above, the Commission has preliminarily concluded that, contrary to the EEOC's statutory responsibility, the EEO Reports may be encouraging employers to discriminate against employees who are not considered ''minorities,'' promoting racial stereotyping, and encouraging employers to engage in discrimination to avoid potential EEOC enforcement actions or to address perceived inequitable outcomes. Because the EEO Reports require employers to impose racial classifications on employees, they are possibly in violation of the constitutional right to equal protection. Additionally, the significant burden imposed on the Commission by the reporting requirements, particularly the EEO–1, is not justified by the limited practical utility for the Commission's enforcement priorities. *See Lincoln* v. *Vigil,* 508 U.S. 182, 192 (1993) (''The allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion. After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.''). As a result, the Commission would not be acting ''prudent[ly] and financially responsibl[y] in the expenditure of funds,'' E.O. 14192, 90 FR at 9065, by retaining the EEO Reports, and therefore EEO regulations requiring the EEO Reports should be rescinded.

## III. Addition of References to the PWFA Under Prior Proposed Rule

In addition to the revisions described above, the Commission reminds stakeholders that, in a November 21, 2024 notice of proposed rulemaking (''NPRM''), the Commission previously proposed incorporating into part 1602 references to the PWFA. 89 FR 92076. Before issuing that NPRM, the Commission issued an interim final rule that implemented changes to its administrative and procedural regulations to include references to the PWFA. 89 FR 11167 (Feb. 14, 2024). That rule, as corrected on May 28, 2024,

did not revise four sections of 29 CFR part 1602 that pertain to recordkeeping, because revisions to those recordkeeping provisions require approval under the PRA, as well as the opportunity for a public hearing pursuant to 42 U.S.C. 2000e–8(c) (as incorporated into the PWFA by 42 U.S.C. 2000gg–2). 44 U.S.C. ch. 35; 89 FR 46021. The November 21, 2024 NPRM proposed to amend §§ 1602.14, 1602.21(b), 1602.28(a), and 1602.31. 89 FR at 92077. On January 8, 2025, the Commission held a public hearing regarding the NPRM. EEOC, *Hearing of January 8, 2025, https://www.eeoc.gov/ meetings/hearing-january-8-2025-hear-public-comment-eeocs-proposed-revision-its-existing/transcript.* No members of the public contacted the agency to request to speak, nor did any member of the public present testimony at the hearing. Further, no public comments were received in response to the NPRM. Given that the Commission is now issuing a second proposed rule that proposes significant changes to part 1602, in the interest of efficient rulemaking, the Commission intends to incorporate the references to the PWFA, as provided in the November 21, 2024 NPRM, into part 1602 as part of any final rule issued at the conclusion of this rulemaking.

## IV. Section-by-Section Analysis of Regulatory Revisions

In accordance with sections II and III, the Commission proposes revising and republishing part 1602 of title 29 of the Code of Federal Regulations. The following section-by-section analysis explains the revisions. First, the Commission proposes to remove sections containing EEO–1, EEO–2, EEO–3, EEO–4, EEO–5, and EEO–6 reporting requirements. Second, the Commission proposes to amend record preservation and recordkeeping sections to remove references to the reporting and associated recordkeeping requirements and to add references to the PWFA. Third, the Commission proposes to amend the recordkeeping requirement in § 1602.20 to conform to the minimum statutory requirement under section 709(c) of Title VII. The record preservation and recordkeeping requirements otherwise remain substantively unchanged. Fourth, the Commission proposes to remove reserved, redundant, and unnecessary sections; and proposes minor corrections to the remaining sections. Fifth, the Commission proposes to remove the subpart headings in part 1602 because the remaining 11 sections are closely related and no subparts are necessary in the revised regulation.

*Revision of § 1602.1 and Removal of §§ 1602.2–1602.6*

The proposed rule contains minor corrections to § 1602.1 to align it more closely with section 709(c) of Title VII. For example, it clarifies that the statute authorizes, but does not require, the Commission to establish regulations under which certain regulated entities must report certain information to the agency. It also removes §§ 1602.2– 1602.6; these sections were reserved and are no longer necessary to the revised regulation.

*Removal of EEO–1 Reporting Requirements and Conforming Amendments*

The proposed rule would remove current § 1602.7, which contains the EEO–1 reporting requirement. The proposed rule also removes § 1602.8, which contains a penalty for making false statements on the EEO–1 report; § 1602.9, which contains the Commission's remedy for a regulated entity's failure to file an EEO–1 report; and § 1602.10, which is currently reserved and therefore unnecessary. It also removes §§ 1602.11 and 1602.12, which reserve to the Commission the right to impose additional reporting or recordkeeping requirements; these sections are unnecessary to retain because section 709(c) of Title VII authorizes the Commission to establish such requirements in the future. The proposed rule removes § 1602.13 because it contains requirements related to the EEO–1 report that are not necessary in the absence of the reporting requirement. The Commission restates its proposal to amend § 1602.14 to add a reference to the PWFA, as first proposed in the Commission's November 21, 2024 NPRM.

*Removal of EEO–2 Reporting Requirements and Conforming Amendments*

The proposed rule would remove § 1602.15, which contains the EEO–2 reporting requirement. The proposed rule would also remove § 1602.16, which contains a penalty for making false statements on the EEO–2 report; § 1602.17, which contains the Commission's remedy for a covered entity's failure to file an EEO–2 report; and § 1602.18 because it is currently reserved and therefore unnecessary. It would further remove § 1602.19, which reserves to the Commission the right to impose additional reporting requirements; this section is unnecessary because section 709(c) of Title VII authorizes the Commission to

establish such requirements in the future.

The Commission also proposes to amend § 1602.20 to remove paragraph (a), which concerned records kept for completing the EEO–2 report; to revise paragraphs (b) and (c) to remove references to the EEO–2 report; to add a definition of ''apprenticeship program'' to paragraph (b); and to revise paragraphs (b) and (c) so that the recordkeeping requirement reflects the minimum that Title VII instructs the Commission to impose. Specifically, the Commission proposes to remove from 29 CFR 1602.20(b)–(c) the requirement that employers, labor organizations, and joint labor-management committees maintain records identifying apprenticeship program applicants' sex and race. Section 709(c) of Title VII requires the Commission to ''by regulation, require each employer, labor organization, and joint labor-management committee . . . to maintain . . . a list of applicants who wish to participate in such [apprenticeship or other training] program, including the chronological order in which applications were received . . . .'' 42 U.S.C. 2000e–8(c). The Commission proposes to amend § 1602.21 to remove references to the EEO–2 report and make conforming amendments, and restates its proposal to add a reference to the PWFA as first proposed in its November 21, 2024 NPRM.

*Removal of EEO–3 Reporting Requirements and Conforming Amendments*

The proposed rule would remove current § 1602.22, which contains the EEO–3 reporting requirement. It would also remove § 1602.23, which contains a penalty for making false statements on the EEO–3 report; § 1602.24, which contains the Commission's remedy for a regulated entity's failure to file an EEO–3 report; and § 1602.25 because it is currently reserved and therefore unnecessary. The proposed rule would further remove § 1602.26, which reserves to the Commission the right to impose additional reporting requirements; this section is unnecessary because section 709(c) of Title VII authorizes the Commission to establish such requirements in the future. The proposed rule removes § 1602.27 because that section contains requirements related to the EEO–3 report that become inapplicable if the reporting requirement is removed. The Commission further proposes to amend § 1602.28 to remove references to the EEO–3 report and make conforming amendments, and restates its proposal

to add a reference to the PWFA as first proposed in its November 21, 2024 NPRM.

*Amendment and Removal of Sections Addressing Applicability of State or Local Law*

The Commission proposes to amend § 1602.29, which addresses the applicability of State or local law to current subparts D through G, to remove references to the EEO–2 and EEO–3 reports and to remove redundant language. The Commission further proposes to remove reference to subparts D through G in § 1602.29 such that the section is generally applicable to each of the proposed record preservation and recordkeeping provisions. As such, the proposed rule would remove several similar sections addressing State and local law in part 1602, specifically current §§ 1602.38, 1602.46, and 1602.55.

*Removal of EEO–4 Reporting Requirements and Conforming Amendments*

The proposed rule would remove § 1602.30, which contains requirements related to the EEO–4 report that become inapplicable if the EEO–4 reporting requirement is removed. The Commission restates its proposal to amend § 1602.31 to add reference to the PWFA, as first proposed in its November 21, 2024 NPRM. The proposed rule would also remove § 1602.32, which contains the EEO–4 reporting requirement; § 1602.33, which contains a penalty for making false statements on the EEO–4 report; § 1602.34, which contains the Commission's remedy for a regulated entity's failure to file an EEO–4 report; and § 1602.35, which is currently reserved and therefore unnecessary. The Commission proposes to amend § 1602.36 to remove a reference to § 1602.30, remove references to subparts I and J, and add a reference to § 1602.31. The proposed rule would also remove § 1602.37 because it reserves to the Commission the right to impose additional reporting or recordkeeping requirements; this section is unnecessary because section 709(c) of Title VII authorizes the Commission to establish such requirements in the future.

*Removal of EEO–5 Reporting Requirements and Conforming Amendments*

The proposed rule would remove § 1602.39, which contains requirements related to the EEO–5 report that are unnecessary in the absence of the reporting requirement. Section 1602.40

remains unchanged. The proposed rule would remove § 1602.41, which contains the EEO–5 reporting requirement; § 1602.42, which contains a penalty for making false statements on the EEO–5 report; § 1602.43, which contains the Commission's remedy for a regulated entity's failure to file an EEO–5 report; and § 1602.44, which is currently reserved and therefore unnecessary. It also removes § 1602.45, which reserves to the Commission the right to impose additional reporting or recordkeeping requirements; this section is unnecessary because section 709(c) of Title VII authorizes the Commission to establish such requirements in the future.

*Removal of EEO–6 Reporting Requirements and Conforming Amendments*

The proposed rule would remove current § 1602.47, and move the substance of the section to a new paragraph (a) under § 1602.49. It would further remove § 1602.48, which contains requirements related to the EEO–6 report that become inapplicable if the EEO–6 reporting requirement is removed. The Commission proposes to renumber § 1602.49 following the addition of a new paragraph (a). The proposed rule would remove § 1602.50 because it contains the EEO–6 reporting requirement; § 1602.51, which contains a penalty for making false statements on the EEO–6 report; § 1602.52, which contains the Commission's remedy for a regulated entity's failure to file an EEO–6 report; and § 1602.53, which is currently reserved and therefore unnecessary. It would further remove § 1602.54, which reserves to the Commission the right to impose additional reporting or recordkeeping requirements; this section is unnecessary because section 709(c) of Title VII authorizes the Commission to establish such requirements in the future.

*Amendment and Removal of Sections Pertaining to Investigations*

The Commission proposes to amend § 1602.56 to remove a reference to the EEO reporting requirements and to clarify that the section applies to record preservation in addition to recordkeeping. The Commission further proposes to remove §§ 1602.57 and 1602.58 because they concern requests for exemption from reporting and would be unnecessary in the absence of the reporting requirements.

## V. Procedural Issues and Regulatory Review

*A. Review Under Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)*

### 1. Introduction

Under E.O. 12866, the Office of Information and Regulatory Affairs ("OIRA") determines whether a regulatory action is significant. 58 FR 51735, 51737–38 (Oct. 4, 1993). Section 3(f) of E.O. 12866 defines a "significant regulatory action" as any regulatory action that is likely to result in a rule that may: (1) have an annual effect on the economy of $100 million or more, or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities; (2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the E.O. 58 FR at 51738.

Executive Orders 12866 and 13563, 76 FR 3821 (Jan. 21, 2011), direct agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs; that it is tailored to impose the least burden on society; that it is consistent with achieving the regulatory objectives; and that, in choosing among alternative regulatory approaches, the agency has selected those approaches that maximize net benefits. E.O. 13563 recognizes that some benefits and costs are difficult to quantify and provides that, where appropriate and permitted by law, agencies may consider and discuss "values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts." *Id.* § 1(c).

OIRA has determined that this proposed rule is economically significant under section 3(f)(1) of E.O. 12866 due to its anticipated savings of $100 million or more in a given year. The analysis provided below outlines the impacts that the Commission anticipates may result from this action and was prepared pursuant to the above-mentioned Executive Orders.

### 2. Need for Removal

As explained in greater detail in Section II of this discussion above, the Commission is proposing to remove EEO–1, EEO–2, EEO–3, EEO–4, EEO–5, and EEO–6 data reporting requirements from the CFR because the Commission has concluded that the collections are overly burdensome, offer insufficient utility, and may be misused.

### 3. Affected Entities

#### (a) EEO–1

EEO–1 annual reporting requirements apply to private employers with 100 or more employees and to federal contractors that have 50 or more employees and meet certain criteria. To estimate the number of entities affected by this requirement we rely on figures from the most recent EEO–1 PRA Notice. 88 FR 27504 (May 2, 2023). In that Notice, the EEOC estimated that 110,000 employers would submit EEO–1 reports to the agency. 88 FR at 27506. For purposes of this NPRM, the Commission believes this estimate remains representative, and therefore that approximately 110,000 employers would be affected by the proposed deregulatory action.

#### (b) EEO–3

EEO–3 biennial reporting requirements apply to local, independent, or unaffiliated unions that have had 100 or more members at any time during the 12 months preceding the due date of the report. To estimate the number of entities affected by this requirement we rely on figures from the most recent EEO–3 PRA Notice. 89 FR 96968 (Dec. 6, 2024). In that Notice, the EEOC estimated 5,999 local unions would submit EEO–3 reports to the agency. 89 FR at 96968–69. For purposes of this NPRM, the Commission believes this estimate remains representative, and therefore that approximately 5,999 local unions would be affected by the proposed deregulatory action.

#### (c) EEO–4

EEO–4 biennial reporting requirements apply to State and local governments with 100 or more employees. To estimate the number of entities affected by this requirement we rely on figures from the most recent EEO–4 PRA Notice. 89 FR 96963 (Dec. 6, 2024). In that Notice, the EEOC estimated 6,607 State and local governments would submit EEO–4 reports to the agency. 89 FR at 96963. For purposes of this NPRM, the Commission believes this estimate remains representative, and therefore that approximately 6,607 State and local governments would be affected by the proposed deregulatory action.

#### (d) EEO–5

EEO–5 biennial reporting requirements apply to public elementary and secondary school systems and districts with 100 or more employees. To estimate the number of entities affected by this requirement we rely on figures from the most recent EEO–5 PRA Notice. 89 FR 96965 (Dec. 6, 2024). In that Notice, the EEOC estimated 10,500 public elementary and secondary school systems and districts would submit EEO–5 reports to the agency. 89 FR at 96966. For purposes of this NPRM, the Commission believes this estimate remains representative, and therefore that approximately 10,500 public elementary and secondary school systems and districts would be affected by the proposed deregulatory action.

#### (e) EEO–2 and EEO–6

The Commission has not required submission of the EEO–2 or EEO–6 since 1981 and 1993, respectively. Rescission of the regulations requiring their submission therefore would not affect any joint labor-management committees or institutions of higher education.

### 4. Costs

#### (a) Introduction

The proposed action is deregulatory; its sole effect is to eliminate certain data collection and reporting obligations. The proposed action is thus not expected to result in any increased costs to private employers, unions, State and local governments, and public elementary and secondary school systems or districts, or any other sector of the economy.

Instead, the proposed action is expected to result in two types of cost savings. First, it is expected to result in annual savings to private employers, unions, State and local governments, and public elementary and secondary school systems or districts equal to the costs associated with preparing and filing the required reports. Second, it is expected to result in annual savings to the EEOC equal to the costs associated with collecting the reports.

#### (b) Cost Savings to the Commission

Based upon estimates provided in the most recent PRA Notices published in the **Federal Register** and approved by OMB under the PRA, the Commission anticipates the following cost savings to the agency. For the EEO–1, the Commission estimates cost savings of $3,892,230 per year. 88 FR 27506. For the EEO–3 and EEO–5, which are biennial collections in even-numbered years, the Commission estimates

costsavings of $378,002 and $492,635 respectively, per reporting cycle. 89 FR at 96966, 96969. For the EEO–4, which is collected biennially in odd-numbered years, the Commission estimates $327,440 in cost savings per reporting cycle. 89 FR at 96963 (cost rounded down from estimate in PRA notice).

(c) Cost Savings to Private Employers

As discussed in Section V.3.i above, the EEOC's most recent EEO–1 PRA Notice (May 2, 2023) estimated 110,000 potential respondents (*i.e.,* private employers) for each reporting cycle (*i.e.,* 2022, 2023, 2024). 88 FR at 27506. Unlike the EEO–3, EEO–4, and EEO–5 data collections, in which each respondent only submits one report, the number of reports submitted by an EEO–1 respondent varies depending on whether the private employer is a "single-establishment employer" [19] or a "multi-establishment employer." [20] Based upon an estimate of 110,000 filers submitting reports, the EEOC estimates these filers (*i.e.,* single-establishment employers and multi-establishment employers) will submit a total of 2,235,938 reports annually resulting in 5,238,467 aggregate burden hours annually. 88 FR at 27506–08.

In that Notice, the EEOC concluded that about 40 percent of EEO–1 filers (*i.e.,* 44,257 single-establishment employers) will submit one report (*i.e.,* a "Single-Establishment Employer Report") on a single establishment. About 60 percent of EEO–1 filers (*i.e.,* 65,743 multi-establishment employers) will report data on multiple establishments. For each reporting year, all multi-establishment employers must submit a "Consolidated Report," a "Headquarters Report," and an "Establishment-Level Report" for each non-headquarters establishment, resulting in an estimated total of 2,191,681 reports submitted. While the actual submission time for each single-establishment employer and multi-establishment employer varies, for purposes of the NPRM the EEOC estimates that it will take a single-establishment employer 45 minutes and the modal (*i.e.,* most common) multi-establishment employer 200 minutes (*i.e.,* 3.33 hours) to complete their EEO–1 reports. Table 1 below outlines the number of reports, the average reporting time by report type, and the aggregate number of hours estimated to submit these reports.

TABLE 1—ESTIMATED ANNUAL BURDEN FOR EEO–1 REPORTING BY REPORT TYPE AND REPORTING TIME

| Type of report | Number of reports | Average reporting time (minutes) | Aggregate reporting time (hours) |
|---|---|---|---|
| Single-Establishment Employer Report | 44,257 | 45 | 33,193 |
| Consolidated Report | 65,743 | 0 | 0 |
| Headquarters Report | 65,743 | 50 | 54,786 |
| Establishment-Level Report | 2,060,195 | 150 | 5,150,488 |
| Total | 2,235,938 | ..................... | 5,238,467 |

The total estimated hourly wage for the likely personnel responsible for preparing these reports is $34.87.[21] The total estimated respondent burden hour cost for all filers is $273,137,678.30 per reporting cycle. 88 FR at 27506. The Commission therefore estimates that the proposed action will generate $273,137,678.30 in cost savings to private employers per year.

(d) Cost Savings to Local Unions

As discussed in Section V.3.ii above, the EEOC's most recent EEO–3 PRA Notice (December 6, 2024) estimates 5,999 potential respondents (*i.e.,* local unions) to the agency's next EEO–3 data collection. 89 FR at 96968–69. For the EEO–3, each respondent submits only one report. As shown in Table 2 below, the estimated average hour burden per report is 1.49 hours.[22] The total estimated biennial respondent burden for all filers is 8,922 hours. The estimated average burden hour cost per report is $59.90,[23] and the estimated total burden hour cost for all filers per biennial collection is $359,091. 89 FR at 96970. The Commission therefore estimates that the proposed action will generate $359,091 in cost savings to local unions per reporting cycle.

TABLE 2—PROJECTED BURDEN FOR EACH EEO–3 BIENNIAL REPORTING CYCLE

[N = 5,999]

| Staff job category | Percent in job category | Median hourly wage rate | Hours per report | Cost per report | Total burden hours | Total burden hour cost |
|---|---|---|---|---|---|---|
| Secretaries and Administrative Assistants | 21.4 | $21.19 | 0.33 | $6.99 | 1,958 | $41,490 |

[19] For purposes of EEO–1 reporting, the EEOC defines a single-establishment employer as an employer with a single establishment where business is conducted or where services or industrial operations are performed. A single-establishment employer is also referred to as a "single-establishment filer" for purposes of EEO–1 reporting.

[20] For purposes of EEO–1 reporting, the EEOC defines a multi-establishment employer as an employer with more than one establishment where business is conducted or where services or industrial operations are performed. A multi-establishment employer is also referred to as a "multi-establishment filer" for purposes of EEO–1 reporting.

[21] This estimate is based on median pay data from the U.S. Bureau of Labor Statistics (BLS). The EEOC estimated that a computer network specialist would account for 60 percent of the estimated hourly wage; a database administrator and architect would account for 20 percent; an HR specialist would account for 10 percent; legal counsel would account for 5 percent; and a CEO would account for 5 percent.

[22] This estimate is based on data gathered from the EEOC's Online Filing System (OFS) for the most recent EEO–3 data collection completed in 2023 (*i.e.,* the 2022 EEO–3 reporting cycle). The OFS captures detailed information on when each filer starts and certifies their report. The 1.49 hours estimate is based on the average time elapsed among filers who completed their reports during the same calendar day within the OFS.

[23] Based upon job titles provided during the most recent EEO–3 data collection (*i.e.,* the 2022 EEO–3 reporting cycle) by individuals completing the report within the OFS, the EEOC identified four specific job categories that account for the largest amount of time spent on EEO–3 reporting. These job categories include: (1) Secretaries and Administrative Assistants; (2) Administrative Services and Facilities Managers; (3) Bookkeeping, Accounting, and Auditing Clerks; and (4) Executive-Level Staff. Hourly wage rates for these four job categories were obtained from the DOL's BLS Occupational Outlook Handbook. *See Occupational Outlook Handbook,* U.S. Bureau of Lab. Stats. (Aug. 28, 2025), *https://www.bls.gov/ooh/.* Please note that the actual job titles reported during the 2022 EEO–3 data collection were collapsed into these four BLS occupational categories.

TABLE 2—PROJECTED BURDEN FOR EACH EEO–3 BIENNIAL REPORTING CYCLE—Continued

[N = 5,999]

| Staff job category | Percent in job category | Median hourly wage rate | Hours per report | Cost per report | Total burden hours | Total burden hour cost |
|---|---|---|---|---|---|---|
| Administrative Services and Facilities Managers | 56.5 | 48.98 | 0.84 | 41.14 | 5,046 | 247,153 |
| Bookkeeping, Accounting, and Auditing Clerks | 5.1 | 22.05 | 0.09 | 1.98 | 546 | 12,039 |
| Executive-Level Staff | 4.4 | 48.12 | 0.06 | 2.89 | 365 | 17,564 |
| Other [a] | 12.6 | 40.56 | 0.17 | 6.90 | 1,007 | 40,845 |
| Total | ........... | ........... | 1.49 | 59.90 | 8,922 | 359,091 |

[a] The average hourly wage rate for the "Other" category was derived by taking the weighted mean average of the hourly wage rates of the four BLS job categories listed in the above table.

(e) Cost Savings to State and Local Governments

As discussed in Section V.3.iii above, the EEOC's most recent EEO–4 PRA Notice (December 6, 2024) estimates 6,607 potential respondents (*i.e.,* State and local governments) to the agency's next EEO–4 data collection. 89 FR at 96963. For the EEO–4, each respondent submits only one report. As shown in Table 3 below, the estimated average burden per report is 2.7 hours per report.[24] The total estimated biennial burden for all filers is 18,094 hours. The estimated average burden hour cost per report is $85.34,[25] and the estimated total burden hour cost for all filers per biennial collection is $563,868.27. 89 FR at 96965. The Commission therefore estimates that the proposed action will generate $563,868.27 in cost savings to State and local governments per reporting cycle.

TABLE 3—PROJECTED BURDEN FOR EACH EEO–4 BIENNIAL REPORTING CYCLE

[N=6,607]

| Staff job category | Percent in job category | Median hourly wage rate | Hours per filer | Total burden hours | Cost per filer | Total burden hour cost |
|---|---|---|---|---|---|---|
| Human Resource Specialists | 68.0 | $30.88 | 2.8 | 12,575 | $86.46 | $388,309.82 |
| Executive-Level Staff | 4.1 | 48.12 | 2.6 | 710 | 125.11 | 34,155.58 |
| Secretaries and Administrative Assistants | 8.1 | 21.19 | 2.4 | 1,289 | 50.86 | 27,309.67 |
| Bookkeeping, Accounting, and Auditing Clerks | 8.8 | 22.05 | 2.5 | 1,450 | 55.13 | 31,972.50 |
| Administrative Services and Facilities Managers | 4.5 | 48.98 | 3.4 | 1,003 | 166.53 | 49,126.94 |
| Database Administrators and Architects | 0.1 | 53.91 | 0.5 | 3 | 26.96 | 134.78 |
| Other [a] | 6.3 | 30.86 | 2.5 | 1,065 | 77.14 | 32,858.98 |
| Average | ........... | ........... | 2.7 | ........... | 85.34 | ........... |
| Total | 100.0 | ........... | ........... | 18,094 | ........... | 563,868.27 |

[a] The average hourly wage rate for the "Other" category was derived by taking the weighted mean average of the hourly wage rates of the six BLS job categories listed in the above table.

(f) Cost Savings to Public Elementary and Secondary School Systems and Districts

As discussed in Section V.3.iv above, the EEOC's most recent EEO–5 PRA Notice (December 6, 2024) estimates 10,500 potential respondents (*i.e.,* public elementary and secondary school systems and districts) to the agency's next EEO–5 data collection. 89 FR at 96963. For the EEO–5, each respondent submits only one report. As shown in Table 4 below, the estimated average hour burden per report is 1.7 hours.[26] The total estimated biennial respondent burden for all filers is 17,927 hours. The estimated average burden hour cost per

[24] This estimate is based on data gathered from the EEOC's OFS for the most recent EEO–4 data collection completed in 2024 (*i.e.,* the 2023 EEO–4 reporting cycle). The OFS captures detailed information on when each filer starts and certifies their report. The time estimates are based on the average time elapsed among filers who completed their report during the same calendar day within the OFS. This methodology was chosen because a single-session submission would also approximate the completion time over several, multi-day sessions.

[25] Based upon job titles provided during the most recent EEO–4 data collection (*i.e.,* the 2023 EEO–4 reporting cycle) by individuals completing the report within the OFS, the EEOC identified six specific job categories that account for the largest amount of time spent on EEO–4 reporting. These job categories include: (1) Human Resource Specialists; (2) Executive-Level Staff; (3) Secretaries and Administrative Assistants; (4) Bookkeeping, Accounting, and Auditing Clerks; (5) Administrative Services and Facilities Managers; and (6) Database Administrators and Architects. Hourly wage rates for these six job categories were obtained from the DOL's BLS Occupational Outlook Handbook. *See Occupational Outlook Handbook, supra* note 32. Please note that the actual job titles reported during the 2023 EEO–4 data collection were collapsed into these six BLS occupational categories.

[26] This estimate is based on data gathered from the EEOC's OFS for the most recent EEO–5 data collection completed in 2023 (*i.e.,* the 2022 EEO–5 reporting cycle). The OFS captures detailed information on when each filer starts and certifies their report. The time estimates are based on the average time elapsed among EEO–5 filers who completed their reports during the same calendar day within the OFS. This methodology was chosen because a single-session submission would also approximate the completion time over several multi-day sessions.

report is $56.90,[27] and the estimated total burden hour cost for all filers per biennial collection is $597,472.29. 89 FR at 96968. The Commission therefore estimates that the proposed action will generate $597,472.29 in cost savings to public elementary and secondary school systems and districts per reporting cycle.

### TABLE 4—PROJECTED BURDEN FOR EACH EEO–5 BIENNIAL REPORTING CYCLE

[N=10,500]

| Staff job category | Percent in job category | Median hourly wage rate | Hours per report | Total burden hours | Cost per report | Total burden hour cost |
|---|---|---|---|---|---|---|
| Human Resource Specialists ................... | 39.1 | $30.88 | 1.9 | 7,807 | $58.67 | $241,078.65 |
| Executive-Level Staff ............................... | 15.9 | 48.12 | 1.7 | 2,829 | 81.80 | 136,153.91 |
| Secretaries and Administrative Assistants | 14.1 | 21.19 | 1.8 | 2,674 | 38.14 | 56,659.49 |
| Bookkeeping, Accounting, and Auditing Clerks .................................................... | 14.0 | 22.05 | 1.3 | 1,904 | 28.67 | 41,993.03 |
| Administrative Services and Facilities Managers ............................................. | 7.7 | 48.98 | 1.4 | 1,137 | 68.57 | 55,707.84 |
| Database Administrators and Architects | 3.0 | 53.91 | 1.3 | 414 | 70.08 | 22,301.40 |
| Other[a] ...................................................... | 6.1 | 37.52 | 1.8 | 1,161 | 67.54 | 43,577.97 |
| Average ............................................. | ........................ | ........................ | 1.7 | ........................ | 56.90 | ........................ |
| Total .......................................... | 100.0 | ........................ | ........................ | 17,927 | ........................ | 597,472.29 |

[a] The average hourly wage rate for the "Other" category was derived by taking the weighted mean average of the hourly wage rates of the six BLS job categories listed in the above table.

### 5. Conclusion

The Commission concludes that this proposed action would impose no regulatory burdens, and that it would generate annual cost savings to private employers, state and local governments, local unions, public elementary and secondary school systems and districts, and the Commission of approximately $278,389,162.58. The Commission further concludes that the proposed action would not affect "values that are difficult or impossible to quantify, such as equity, human dignity, and fairness." E.O. 13563, "Improving Regulation and Regulatory Review," 76 FR 3821 (Jan 21, 2011).

The Commission invites public comment on the accuracy and completeness of the foregoing analysis. Please see the **ADDRESSES** and **DATES** sections of this notice for more information on how to submit comments.

### B. Review Under the Regulatory Flexibility Act

When an agency issues a rulemaking proposal, the Regulatory Flexibility Act ("RFA"), 5 U.S.C. 601–612, requires the agency to "prepare and make available for public comment an initial regulatory flexibility analysis" that will "describe the impact of the proposed rule on small entities." 5 U.S.C. 603(a). Section 605 of the RFA allows an agency to certify a rule, in lieu of preparing an analysis, if the proposed rulemaking is not expected to have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605(b).

Given this proposed action will impose no regulatory burdens, and that it will generate annual cost savings to private employers, including small entities, the Commission hereby certifies that this rule will not have a significant economic impact on a substantial number of small entities.

### C. Review Under the Paperwork Reduction Act

The PRA requires the Commission to consider the impact of information collection burdens imposed on the public. The PRA typically requires an agency to provide notice and seek public comments on any "collection of information" contained in a rule. *See* 44 U.S.C. 3506(c)(2)(B); 5 CFR 1320.8. The Commission has determined that there is no new requirement for information collection associated with this proposed rule. Regarding the Commission's intention to include four references to the PWFA, as proposed in its November 21, 2024 NPRM, in any final rule issued in connection with this proposed rulemaking, the Commission has provided the requisite notice and sought public comment in accordance with the PRA, as described in section III. In issuing a final rule, the Commission will comply with its obligations under the PRA that are associated with the PWFA references.

### D. Review Under the Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 ("UMRA") requires each Federal agency to assess the effects of Federal regulatory actions on State, local, and Tribal governments and the private sector. 2 U.S.C. 1531. For a regulatory action likely to result in a rule that may cause the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector of $100 million or more in any one year (adjusted annually for inflation), section 202 of UMRA requires a Federal agency to publish a written statement that estimates the resulting costs, benefits, and other effects on the national economy. 2 U.S.C. 1532(a), (b). The UMRA also requires a Federal agency to develop an effective process to permit timely input by elected officers of State, local, and Tribal governments on a "significant intergovernmental mandate," and requires an agency plan for giving notice and opportunity for timely input to potentially affected small governments before establishing any requirements that might significantly or uniquely affect them.

The Commission examined this proposed rule according to UMRA and its statement of policy and determined that the rule does not contain a Federal intergovernmental mandate and is not expected to require expenditures of $100 million or more in any one year by State, local, and Tribal governments, in

[27] Based upon job titles provided during the 2022 EEO–5 data collection by individuals completing the report within the OFS, the EEOC has identified six specific job categories which account for the largest amount of time spent on EEO–5 reporting. These job categories include: (1) Human Resource Specialists; (2) Executive-Level Staff; (3) Secretaries and Administrative Assistants; (4) Bookkeeping, Accounting, and Auditing Clerks; (5) Administrative Services and Facilities Managers; and (6) Database Administrators and Architects. Hourly wage rates for these six job categories were obtained from the DOL's BLS Occupational Outlook Handbook. *See Occupational Handbook, supra* note 32. Please note that the actual job titles reported during the 2022 EEO–5 data collection were collapsed into these six BLS occupational categories.

the aggregate, or by the private sector. As a result, the analytical requirements of UMRA do not apply.

*E. Review Under Section 654 of the Treasury and General Government Appropriations Act*

Section 654 of the Treasury and General Government Appropriations Act, 5 U.S.C. 601, note, requires federal agencies to submit to the Director of OMB an assessment of any policy or regulation that may affect family well-being. This proposed rule is not expected to affect family well-being. Section 654 therefore does not require an assessment.

*F. Review Under Executive Order 12630*

E.O. 12630, "Governmental Actions and Interference with Constitutionally Protected Property Rights," 53 FR 8859 (Mar. 18, 1988), requires federal agencies to adhere to certain principles when adopting or implementing "policies that have takings implications," which include "Federal regulations, proposed Federal regulations, proposed Federal legislation, comments on proposed Federal legislation, or other Federal policy statements that, if implemented or enacted, could effect a taking" of private property under the Just Compensation Clause of the Fifth Amendment to the U.S. Constitution. The Commission has determined that this proposed rule will not result in any takings for purposes of the Fifth Amendment. The requirements of E.O. 12630 therefore do not apply.

*G. Review Under Executive Order 12988*

Section 3(a) of E.O. 12988, "Civil Justice Reform," 61 FR 4729 (Feb. 7, 1996), requires agencies to adhere to the following requirements when promulgating new regulations: (1) eliminate drafting errors and ambiguity, (2) write regulations to minimize litigation, (3) provide a clear legal standard for affected conduct rather than a general standard, and (4) promote simplification and burden reduction. Section 3(b) of E.O. 12988 further requires that agencies make every reasonable effort to ensure that the regulation: (1) clearly specifies the preemptive effect, if any, (2) clearly specifies any effect on existing federal law or regulation, (3) provides a clear legal standard for affected conduct while promoting simplification and burden reduction, (4) specifies the retroactive effect, if any, (5) adequately defines key terms, and (6) addresses other important issues affecting clarity and general draftsmanship under any guidelines issued by the Attorney General. This document is consistent with these requirements.

*H. Review Under Executive Order 13045*

E.O. 13045, "Protecting Children From Environmental Health Risks and Safety Risks," 62 FR 19885 (Apr. 23, 1997), requires federal agencies to provide OIRA with certain information when promulgating a regulation that is economically significant under E.O. 12866 and that "concern[s] an environmental health risk or safety risk that an agency has reason to believe may disproportionately affect children." This proposed rule does not concern an environmental, health, or safety risk that the EEOC has reason to believe would have a disproportionate effect on children. The requirements of E.O. 13045 therefore do not apply.

*I. Review Under Executive Order 13132*

E.O. 13132, "Federalism," 64 FR 43255 (Aug. 10, 1999), imposes certain requirements on federal agencies formulating and implementing policies or regulations that preempt state law or that have federalism implications. The E.O. requires agencies to examine the constitutional and statutory authority supporting any action that would limit the policymaking discretion of the States and to carefully assess the necessity for such actions. The E.O. also requires agencies to have an accountable process to ensure meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications.

The Commission has examined this proposed rule and has determined that it would not have a substantial direct effect on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. The requirements of E.O. 13132 therefore do not apply.

*J. Review Under Executive Order 13175*

E.O. 13175, "Consultation and Coordination With Indian Tribal Governments," 65 FR 67249 (Nov. 9, 2000), requires federal agencies to take certain actions when adopting "policies that have tribal implications," meaning "regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes." The Commission has determined that this proposed rule is not a "policy that has tribal implications," and therefore that the requirements of E.O. 13175 do not apply.

*K. Review Under Executive Order 13211*

E.O. 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use," 66 FR 28355 (May 22, 2001), requires agencies to prepare and submit a Statement of Energy Effects for all "significant energy actions." A "significant energy action" is any action by an agency that promulgates or is expected to lead to the promulgation of a final rule or regulation: (1) (i) that is a significant regulatory action under E.O. 12866 or any successor order, and (ii) is likely to have a significant adverse effect on the supply, distribution, or use of energy; or (2) that is designated by the Administrator of OIRA as a significant energy action. The EEOC has determined that this proposed rule is not likely to have a significant adverse effect on the supply, distribution, or use of energy, and has not been designated by the Administrator of OIRA as a significant energy action. Therefore, a Statement of Energy Effects is not required.

*L. Review Under Executive Order 14192*

E.O. 14192, "Unleashing Prosperity Through Deregulation," 90 FR 9065 (Jan. 31, 2025), requires that any new incremental costs associated with new regulations shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least 10 prior regulations. This proposed rule is expected to be a deregulatory action for purposes of E.O. 14192. As explained in Section V.A of this proposed rule above, the action is estimated to result in cost savings of $278,389,162.48 annually.

*M. Review Under Executive Order 14215*

E.O. 14215, "Ensuring Accountability for All Agencies," 90 FR 10447 (Feb. 24, 2025), requires all federal agencies to submit for review all proposed and final significant regulatory actions to OIRA before publication in the **Federal Register**. The EEOC has complied with this requirement.

*N. Plain Language*

E.O. 12866, "Regulatory Planning and Review," 58 FR 51735 (Oct. 4, 1993), E.O. 13563, "Improving Regulation and Regulatory Review," 76 FR 3821 (Jan 21, 2011), the Plain Writing Act of 2010, 5 U.S.C. 301 note, and President Clinton's Memorandum of June 1, 1998, entitled "Plain Language in Government," 63 FR 31885 (June 10, 1998), require federal agencies to write rules and other documents using plain language. The

Commission has attempted to draft this proposed rule in plain language.

## List of Subjects in 29 CFR Part 1602

Administrative practice and procedure, Equal employment opportunity, Records, Record preservation, Recordkeeping.

For the reasons set forth in the preamble, and under the authority of 42 U.S.C. 2000e–8, 42 U.S.C. 2000e–12, 42 U.S.C. 12117, 42 U.S.C. 2000ff–6, 42 U.S.C. 2000gg–2, 44 U.S.C. 3501–3521, the Equal Employment Opportunity Commission proposes to amend part 1602 of title 29 of the Code of Federal Regulations by revising and republishing part 1602, as follows:

■ 1. Revise and republish part 1602 to read as follows:

## PART 1602—RECORD PRESERVATION AND RECORDKEEPING REQUIREMENTS UNDER TITLE VII, THE ADA, GINA, AND THE PWFA

Sec.
1602.1    Purpose and scope.
1602.14.    Preservation of records made or kept.
1602.20.    Records to be made or kept.
1602.21.    Preservation of records made or kept.
1602.28.    Preservation of records made or kept.
1602.29.    Applicability of State or local law.
1602.31.    Preservation of records made or kept.
1602.36.    Schools exemption.
1602.40.    Preservation of records made or kept.
1602.49.    Preservation of records made or kept.
1602.56.    Investigation of recordkeeping violations.

**Authority:** 42 U.S.C. 2000e–8, 2000e–12; 42 U.S.C. 12117; 42 U.S.C. 2000ff–6; 42 U.S.C. 2000gg–2; 44 U.S.C. 3501–3521.

## § 1602.1    Purpose and scope.

Section 709 of title VII (42 U.S.C. 2000e–8), section 107 of the Americans with Disabilities Act (ADA) (42 U.S.C. 12117), section 207(a) of the Genetic Information Nondiscrimination Act (GINA) (42 U.S.C. 2000ff–6), and section 104 of the Pregnant Workers Fairness Act (PWFA) (42 U.S.C. 2000gg–2) authorize the Commission to establish regulations pursuant to which certain entities subject to those Acts shall make and preserve certain records and shall furnish specified information to aid in the enforcement of the Acts.

## § 1602.14    Preservation of records made or kept.

Any personnel or employment record made or kept by an employer (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of one year from the date of termination. Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under title VII, the ADA, GINA, or the PWFA, the respondent employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or the action. The term ''personnel records relevant to the charge,'' for example, would include personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected. The date of ''final disposition of the charge or the action'' means the date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court or, where an action is brought against an employer either by the aggrieved person, the Commission, or by the Attorney General, the date on which such litigation is terminated.

(Approved by the Office of Management and Budget under control number 3046–0040)

## § 1602.20    Records to be made or kept.

(a) Every employer, labor organization, and joint labor-management committee subject to title VII which controls an apprenticeship program shall maintain a list of applicants who wish to participate in such program, including the chronological order in which applications were received. (See section 709(c), title VII, Civil Rights Act of 1964.).

(b) The words ''applicant'' and ''application'' as used in this section refer to situations involving actual applications only. An applicant is considered to be a person who files a formal application, or in some informal way indicates a specific intention to be considered for admission to the apprenticeship program. A person who casually appears to make an informal inquiry about the program, or about apprenticeship in general, is not considered to be an applicant. For the purposes of this section, the term ''apprenticeship program'' means a plan containing all terms and conditions for the qualification, recruitment, selection, employment, and training of apprentices, including such matters as the requirement for a written apprenticeship agreement.

(c) In lieu of maintaining the chronological list referred to in paragraph (a) of this section, persons required to compile the list may maintain on file written applications for participation in the apprenticeship program, provided that the application form contains a notation of the date the form was received.

## § 1602.21    Preservation of records made or kept.

(a) Notwithstanding the provisions of § 1602.14, every person subject to § 1602.20 shall preserve the list of applicants or application forms, as the case may be, for a period of two years from the date the application was received.

(b) Other records: Except to the extent inconsistent with the law or regulation of any State or local fair employment practices agency, or of any other Federal or State agency involved in the enforcement of an anti-discrimination program in apprenticeship, other records relating to apprenticeship made or kept by an employer, labor organization, or joint labor-management committee subject to Title VII which controls an apprenticeship program, including but not necessarily limited to requests for reasonable accommodation, test papers completed by applicants for apprenticeship and records of interviews with applicants, shall be kept for a period of two years from the date of the making of the record. Where a charge of discrimination has been filed, or an action brought by the Attorney General under Title VII, the ADA, GINA, or the PWFA, the respondent shall preserve all records relevant to the charge or action until final disposition of the charge or the action. The term ''records relevant to the charge,'' for example, would include applications, forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the charging party applied and was rejected. The date of ''final disposition of the charge or the action'' means the date of expiration of the statutory period within which a charging party may bring an action in a

U.S. District Court or, where an action is brought either by a charging party or by the Attorney General, the date on which such litigation is terminated.

(Approved by the Office of Management and Budget under control number 3046–0040)

**§ 1602.28    Preservation of records made or kept.**

(a) Any labor organization identified as a ''referral union,'' meaning any union under whose normal methods of operation members customarily and regularly seek or gain employment through the union or an agent of the union, shall preserve membership or referral records (including applications for same) made or kept by it for a period of one year from the date of the making of the record. Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against a labor organization under Title VII, the ADA, GINA, or the PWFA, the respondent labor organization shall preserve all records relevant to the charge or action until final disposition of the charge or the action. The date of ''final disposition of the charge or the action'' means the date of expiration of the statutory period within which the aggrieved person may bring an action in a U.S. District Court or, where an action is brought against a labor organization either by the Commission, the aggrieved person, or by the Attorney General, the date on which such litigation is terminated.

(b) Nothing herein shall relieve any labor organization covered by title VII of the obligations set forth in §§ 1602.20 and 1602.21, relating to the establishment and maintenance of a list of applicants wishing to participate in an apprenticeship program controlled by it.

(Approved by the Office of Management and Budget under control number 3046–0040)

**§ 1602.29    Applicability of State or local law.**

The requirements imposed by the Commission in these regulations supersede any provisions of State or local law which may conflict with them.

**§ 1602.31    Preservation of records made or kept.**

Any personnel or employment record made or kept by a political jurisdiction (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, layoff, or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the political jurisdiction for a period of two years from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of two years from the date of termination. Where a charge of discrimination has been filed, or an action brought by the Attorney General against a political jurisdiction under Title VII, the ADA, GINA, or the PWFA, the respondent political jurisdiction shall preserve all personnel records relevant to the charge or action until final disposition of the charge or the action. The term ''personnel record relevant to the charge,'' for example, would include personnel or employment records relating to the person claiming to be aggrieved and to all other employees holding positions similar to that held or sought by the person claiming to be aggrieved; and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the person claiming to be aggrieved applied and was rejected. The date of ''final disposition of the charge or the action'' means the date of expiration of the statutory period within which a person claiming to be aggrieved may bring an action in a U.S. District Court or, where an action is brought against a political jurisdiction either by a person claiming to be aggrieved or by the Attorney General, the date on which such litigation is terminated.

(Approved by the Office of Management and Budget under control number 3046–0040)

**§ 1602.36    Schools exemption.**

The record preservation requirements of § 1602.31 shall not apply to State or local educational institutions or to school districts or school systems or any other educational functions.

**§ 1602.40    Preservation of records made or kept.**

Any personnel or employment record made or kept by a school system, district, or individual school (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, layoff, or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by such school system, district, or school, as the case may be, for a period of two years from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of two years from the date of termination. Where a charge of discrimination has been filed, or an action brought against an elementary or secondary school by the Commission or the Attorney General, the respondent elementary or secondary school system, district, or individual school shall preserve similarly at the central office of the system or district or individual school which is the subject of the charge or action, where more convenient, all personnel records relevant to the charge or action until final disposition of the charge or the action. The term ''personnel record relevant to the charge,'' for example, would include personnel or employment records relating to the person claiming to be aggrieved and to all other employees holding positions similar to that held or sought by the person claiming to be aggrieved; and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the person claiming to be aggrieved applied and was rejected. The date of ''final disposition of the charge or the action'' means the date of expiration of the statutory period within which a person claiming to be aggrieved may bring an action in a U.S. District Court or, where an action is brought against a school system, district, or school either by a person claiming to be aggrieved, the Commission, or the Attorney General, the date on which such litigation is terminated.

(Approved by the Office of Management and Budget under control number 3046–0040)

**§ 1602.49    Preservation of records made or kept.**

(a) Under this section, the term ''institution of higher education'' means an institutional system, college, university, community college, junior college, and any other educational institution which offers an associate degree, baccalaureate degree or higher degree or which offers a two year program of college level studies without degree. The term ''college level studies'' means a post secondary program which is wholly or principally creditable toward a baccalaureate degree or terminates in an associate degree.

(b) Any personnel or employment record (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, tenure, demotion, transfer, layoff, or termination, rates of pay or

other terms of compensation, and selection for training) made or kept by an institution of higher education shall be preserved by such institution of higher education for a period of two years from the date of the making of the personnel action or record involved, whichever occurs later. In the case of the involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of two years from the date of termination. Where a charge of discrimination has been filed, or a civil action brought against an institution of higher education by the Commission or the Attorney General, the respondent shall preserve similarly at the central administrative office of the institution of higher education, at the central office of a separate campus or branch, or at the individual school which is the subject of the charge or action, where more convenient, all personnel records relevant to the charge or action until final disposition of the charge or the action. The term ''personnel records relevant to the charge,'' for example, would include personnel or employment records relating to the person claiming to be aggrieved and to all other employees holding positions similar to that held or sought by the person claiming to be aggrieved; it would also include application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the person claiming to be aggrieved applied and was rejected. The date of ''final disposition of the charge or the action'' means the date of expiration of the statutory period within which a person claiming to be aggrieved may bring an action in the United States District Court, or, where an action is brought against an institution of higher education by a person claiming to be aggrieved, the Commission, or the Attorney General, the date on which such litigation is terminated.

(c) The requirements of paragraph (b) of this section shall not apply to application forms and other preemployment records of non-student applicants for positions known to non-student applicants to be of a temporary or seasonal nature.

(Approved by the Office of Management and Budget under control number 3046–0040)

### § 1602.56   Investigation of recordkeeping violations.

When it has received an allegation, or has reason to believe, that a person has not complied with the record preservation and recordkeeping requirements of this part or of part 1607 of this chapter, the Commission may conduct an investigation of the alleged failure to comply.

■ 2. Redesignate §§ 1602.14 through 1602.56 as follows:

| Old section | New section |
|-------------|-------------|
| 1602.14 | 1602.2 |
| 1602.20 | 1602.3 |
| 1602.21 | 1602.4 |
| 1602.28 | 1602.5 |
| 1602.29 | 1602.10 |
| 1602.31 | 1602.6 |
| 1602.36 | 1602.7 |
| 1602.40 | 1602.8 |
| 1602.49 | 1602.9 |
| 1602.56 | 1602.11 |

Dated: July 21, 2026.
For the Commission.

**Andrea R. Lucas,**
*Chair.*
[FR Doc. 2026–14937 Filed 7–22–26; 8:45 am]
**BILLING CODE 6570–01–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–R03–OAR–2026–0630; FRL–13351–01–R3]

### Air Plan Approval; Pennsylvania; Revision to Source-Specific Reasonably Available Control Technology (RACT) Requirements

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to approve a state implementation plan (SIP) revision submitted by the Pennsylvania Department of Environmental Protection on behalf of the Commonwealth of Pennsylvania. This revision pertains to previously approved, source-specific reasonably available control technology (RACT) requirements for the Equitrans, Inc. Hartson Compressor Station in Washington County, Pennsylvania. This proposed action is being taken under the Clean Air Act (CAA).

**DATES:** Written comments must be received on or before August 24, 2026.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R03–OAR–2026–0630 at *www.regulations.gov,* or via email to *supplee.gwendolyn@epa.gov.* For comments submitted at *Regulations.gov,* follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov.* For either manner of submission, EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be confidential business information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.* on the web, cloud, or other file sharing system). For additional submission methods, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section. For the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *www.epa.gov/dockets/commenting-epa-dockets.*

**FOR FURTHER INFORMATION CONTACT:** David Talley, Permits Branch (3AD10), Air & Radiation Division, U.S. Environmental Protection Agency, Region III, 1600 John F Kennedy Boulevard, Philadelphia, Pennsylvania 19103. The telephone number is (215) 814–2117. Mr. Talley can also be reached via electronic mail at *talley.david@epa.gov.*

**SUPPLEMENTARY INFORMATION:** On January 21, 2025, the Pennsylvania Department of Environmental Protection (PADEP) submitted a revision to the Pennsylvania SIP relating to source-specific RACT requirements at the Equitrans, Inc. Hartson Compressor Station in Washington County, Pennsylvania.

### I. Background

*A. RACT Requirements for Ozone*

The CAA regulates emissions of oxides of nitrogen ($NO_X$) and volatile organic compounds (VOC) from certain sources in certain parts of the country to prevent photochemical reactions that result in ground-level ozone formation. RACT is an important strategy for reducing $NO_X$ and VOC emissions from major stationary sources. Areas designated nonattainment for the ozone NAAQS are subject to the general nonattainment area planning requirements of CAA section 172. Section 172(c)(1) of the CAA provides that SIPs for nonattainment areas must include reasonably available control measures (RACM), including emissions reductions from existing sources through adoption of RACT. Further, section 182(b)(2) of the CAA sets forth three specific RACT requirements for